**In re YANKTON COLLEGE, Debtor.**

**Bankruptcy No. 484–00416.**

United States Bankruptcy Court,
D. South Dakota.

June 7, 1989.

Robert E. Hayes, Davenport, Evans, Hurwitz & Smith, Sioux Falls, S.D., for debtor.

David L. Nadolski, Quaintance and Johnson, Sioux Falls, S.D., Jonathan K. Van Patten, Vermillion, S.D., for Unsecured Creditors Committee.

Andrew J. Schmid, Office of the U.S. Trustee, Minneapolis, Minn.

## MEMORANDUM DECISION

PEDER K. ECKER, Bankruptcy Judge.

### INTRODUCTION

This Chapter 11 case is before the Court pursuant to applications for fees filed by James S. Mitchell ("Mitchell") and John R. Kabeiseman ("Kabeiseman"), attorneys for the debtor, Yankton College ("College"), and David C. Humphrey ("Humphrey"), attorney for the Unsecured Creditors Committee ("UCC"). This case is presented on the United States Trustee's (U.S. Trustee's) objections and the Court's duty to scrutinize fee applications independent of objections. A hearing on the matter was held May 6, 1988, in Sioux Falls, South Dakota. After receiving evidence at the hearing and arguments of counsel, the Court took the matter under advisement.

### BACKGROUND

The debtor filed for protection under Chapter 11 of the Bankruptcy Code on December 21, 1984. Prior to filing, the College, commencing perhaps as early as 1974 or 1975, had struggled with financial problems which became acute in the latter part of 1984. After lengthy meetings by the College's Board of Trustees, it was determined that a Chapter 11 filing was the most appropriate means to preserve the value of the debtor's assets.

The board of trustees engaged in a careful analysis of its options, and this analysis included the problem of selecting counsel. Consideration was given to the likely complexity of the case and the need for counsel to be able to manage that complexity, the potential for numerous conflicts of interest among South Dakota attorneys, the pros and cons of out-of-state counsel, and the need for local counsel. After the board of trustees decided to proceed with the Chapter 11 filing, they retained Mitchell and Kabeiseman as counsel for the debtor. Humphrey was retained as the attorney for the UCC on February 1, 1985.

The debtor faced a number of extraordinary problems from the outset, amid tremendous pressure from within and outside the College, along with accompanying adverse publicity. The circumstance of filing during an academic semester presented a myriad of problems connected with completing the semester, arranging student transfers to other schools, assisting faculty in obtaining other employment, and accommodating the financial needs of employees of the College affected by the closing during a time in which the College could not meet its payroll. The board of trustees had recently recruited a new president and found themselves being sued by this man shortly thereafter. While all this was going on, counsel and College officials, because of the College's lack of adequate financial books and records, attempted to reconstruct the College's books and records to deal with the filing of the required bank-

ruptcy schedules. Not surprisingly, the books and records were in some disarray and this required significant effort on the part of applicants and the College's remaining staff. The bankruptcy schedules which could not be completed until February 1, 1985, reflect a total of 779 creditors were involved in the case and known to the debtor at that time.[1]

From the outset, this was not anything like a "typical" Chapter 11 reorganization. The College was an educational institution with great public importance to the students, faculty, staff, the City of Yankton, and the State of South Dakota. But its highly visible financial crisis brought anger, bitterness, and divisiveness as well.

From the bankruptcy standpoint, it was very difficult to assess at the outset where the final outcome might lie. This was an institution with a long tradition and there was sentiment in favor of reorganization and reopening of the College. In light of the damaging publicity and chaotic financial situation, the more realistic scenario was an orderly liquidation. This alternative, clearly, would take some time. The assets of the College had certain intrinsic value, but the problem of identifying and persuading a buyer who would pay that value seemed at times insurmountable.

One alternative which the College administration strenuously sought to avoid was the quick liquidation or "gavel" sale of the assets. There was a strong desire to see that all who had dealt with the College would be dealt with equitably and honorably. A quick liquidation would bring the lowest possible return on the assets and leave only enough to pay the secured debt, while leaving the unsecured creditors with little or no dividend. There was significant pressure, however, from one secured creditor for just such a liquidation. Thus, the worst case, but not unlikely case, scenario would have resulted in a "no asset" or "low asset" case from the standpoint of the unsecured creditors. Humphrey, as the attorney for the UCC, made the initial assessment that a quick liquidation was not in the best interests of the unsecured creditors. A plan for utilization of the real estate was the key to the unsecured creditors' chances of recovery of even a minimal portion of their claims. Humphrey made the decision to cooperate with the College administration in a "workout" of the problems. Efforts were directed toward keeping the reorganization viable until such time as the College could reopen or a suitable buyer could be found. Don Peterson (acting president for the College) and Julie Hisel (business manager for the College) with the College worked with Mitchell and Kabeiseman, attorneys for the College, and Humphrey, attorney for the UCC, toward that end. The Court characterizes this group of five individuals as the "reorganization team."

Before any plan toward that end could be formulated, there were a number of critical short-run problems requiring immediate attention. First, there were problems with maintaining the value of the assets. With the rather sudden closing of the College, there were opportunities for unscrupulous or disgruntled individuals to seek self-help or revenge during the initial chaotic stages of the reorganization when measures to ensure the security of the assets were not yet in place. The reorganization team developed the following measures: (1) ensuring a correct inventory of all assets, including the real estate and personal property located in each building; (2) attempting to determine a value of said property; and (3) ensuring a method of securing said property from deterioration or loss.

It was important from the unsecured creditors' standpoint that the initial shock of the bankruptcy filing did not precipitate a collapse of the College's reorganization. The reorganization team therefore became involved in the monitoring of claims, specifically the assessment of the nature, extent, and validity of the outstanding claims and the payment of operating expenses during the initial stages of the reorganization.

1. Eventually, a total of over 900 creditors became involved in the case and were dealt with by the applicants.

Attention to details by this group of the daily operation became a necessity because there was no one else left to administer the College and because the operating funds were so low that even the details became significant. Decisions concerning the minimum maintenance of the buildings and grounds are just one example.

The applicants needed to formulate an overall strategy, so they, along with the other members of the reorganization team, developed a financial and political support system to preserve the assets for either reorganization under a Chapter 11 plan or for an orderly liquidation with the minimum depletion of assets available to the creditors. With almost daily contact among members of the reorganization team, there was an ongoing effort to bring available resources of the city, county, and state governments into play to utilize their resources rather than those of the College.

Once the reorganization team gained control of the short-range asset and debt problems, they set into motion a long-range plan involving an attempt to convince the city and county governments to focus their attention on utilization of the existing real estate. A community task force through the Yankton Chamber of Commerce was organized, resulting in a marketing effort which produced over sixty inquiries, some not serious and some serious. The property was considered the real estate for corporate headquarters, and for alternative education, religious, or seminary uses.

In one particular instance, not long after the initial filing of the case, the reorganization team received an interesting overture. They were contacted by individuals interested in reopening the College. These individuals were willing to commit to an effort to raise funds for operations and recapitalization. Although the effort was unsuccessful, it was a bona fide proposal, and a good deal of time, effort, and expense were expended by the applicants. The desirability of reopening the College focused not only on leaving the College as a viable educational institution, but also on the fact that this was the best way to maximize the value of the assets and permit payment to the creditors. This effort continued for the best part of a year-and-a-half.

In order to ensure continued activity, it was necessary to work closely with the local media, public officials, and community leaders in order to retain general public interest in the reorganization project.

Efforts to deal with certain outstanding claims were vital to effectuate the reorganization. A major unsecured priority claim was filed by the United States Government, Office of Education, in the amount of $2.9 million for various programs and grants which the College had received over the last several years before filing under Chapter 11 in 1984. With personal expertise in the area of government funding, Humphrey, as part of the reorganization team, assisted in identification and negotiation of government grant funding problems. This claim was eventually reduced to approximately $80,000.

By October of 1985, it became apparent that marketing efforts, although extensive, were not successful. As a result of this, a number of creditors, both secured and unsecured, were becoming impatient with the lack of progress in the case. Among the creditors seeking to enlist the support of the UCC in a motion to dismiss or convert the case were the American State Bank (secured creditor) and, later, First Dakota National Bank (secured creditor), several unsecured creditors, and Doug Cummings, attorney for fifty-three faculty members who held priority and unsecured claims. At this point, the reorganization team determined that it would be necessary to insist that the College use available funds to purchase the secured creditors' interests, and other interests which threatened to seek dismissal. Prevention of dismissal or conversion preserved the operation and made possible the later success.

The reorganization team maintained the operation, pursued leads, and fostered community support until such time as the right buyer was finally located. It was at this point, some three years later, that negotiations with the Federal Bureau of Prisons commenced. After the applicants had gained the Yankton community's approval

and support, they went ahead with the sale to the Federal Bureau of Prisons. The negotiations with the Federal Bureau of Prisons resulted in the sale of assets for approximately $3.5 million which pays off 100% of all claims of the debtor, including unsecured claims, pays all fees and expenses, and leaves in excess of $1 million for the charitable and educational purposes of the debtor.[2]

Mitchell and the Baird Law Firm claimed 2,517.34 hours worked and sought payment varying from $50 (paralegal rate) to $145 per hour. The total fees and expenses requested is $417,735.88. Kabeiseman and the Brady Law Firm claimed 952.25 hours worked and sought payment varying from $110 to $125 per hour. The total fees and expenses requested is $112,367.10. Humphrey claimed 620.26 hours worked and sought payment varying from $20 (paralegal rate) to $100 per hour. Humphrey also requested a $25–per–hour bonus. The total fees and expenses requested is $88,556.61.

At a hearing on May 6, 1988, the Court granted counsel for debtor and counsel for the UCC an allowance of interim compensation. On May 11, 1988, a preliminary order was entered allowing Mitchell and the Baird Law Firm interim compensation and reimbursement of expenses in the amount of $296,228.00; Kabeiseman and the Brady Law Firm received interim compensation and reimbursement of expenses in the amount of $56,365.00; Humphrey received interim compensation and reimbursement of expenses in the amount of $18,047.50. Accordingly, the above amounts are to be subtracted from the total fees and expenses granted in the above-entitled matter. Also, a retainer in the amount of $3,462.11 was paid to Mitchell and will be subtracted from his total fees and expenses granted in this matter.

The Court heard testimony from a witness whom the Court finds and considers an expert in the area of bankruptcy law as well as in attorneys' fees in bankruptcy matters. This expert's name is J. Bruce Blake of Sioux Falls, South Dakota. Mr. Blake has practiced bankruptcy law in the State of South Dakota for many years and is considered, by his peers, to be one of the top-rated attorneys in the field of bankruptcy in this state. Mr. Blake reviewed the applications of Mitchell, Kabeiseman, and Humphrey together with the U.S. Trustee's objections. In the opinion of Mr. Blake, the requested fees and expenses, of all three applicants, were reasonable considering the complex nature and the exceptional result of this Chapter 11 case.

In making its decision, the Court has considered the entire record in this matter as well as the applications for compensation and objections thereto.

## I. ATTORNEY'S FEES UNDER THE BANKRUPTCY CODE

### A. *General Discussion*

Applications for attorney's fees are governed by Section 330 of the Bankruptcy Code, which provides as follows:

(a) After notice to any parties in interest and to the United States trustee and a hearing, ... the court may award ... to a professional person employed under section 327 or 1103 of this title, or to the debtor's attorney—

(1) reasonable compensation for actual, necessary services rendered by such ... professional person, or attorney, as the case may be, and by any paraprofessional persons employed by such ... professional person, or attorney, as the case may be, based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services other than in a case under this title; and

(2) reimbursement for actual, necessary expenses.

Given this statutory scheme, *In re Pettibone Corp.*, 74 B.R. 293, 305 (Bankr.N.D. Ill.1987), the starting point which bankruptcy courts have traditionally employed for

---

**2.** Total secured debt was $1,000,020.00; priority debt was $843,659.09; unsecured debt was $570,000.00.

arriving at a reasonable fee under 11 U.S.C. § 330 is to multiply a reasonable hourly rate times the number of hours worked [lodestar method]. *Matter of Schaeffer*, 71 B.R. 559, 562 (Bankr.S.D. Ohio 1987). This "lodestar" may then be adjusted upward or downward based upon a variety of factors, including the novelty and difficulty of the work performed, the results obtained, and the risk of loss. *Schaeffer*, 71 B.R. at 562. This formulation is a hybrid of the lodestar approach of the Third Circuit (*Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161, 167 (3d Cir. 1973)) and the twelve-factor approach of the Fifth Circuit (*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974)), [and made applicable in the bankruptcy context by] *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir.1977), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). *See Schaeffer*, 71 B.R. at 562. The twelve factors set forth in the *Johnson* case are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill required to perform legal services properly; (4) the preclusion of employment due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. *Johnson*, 488 F.2d at 717–19.

The bankruptcy judge should be familiar with fees charged in the legal profession and experienced at evaluating the quality of legal work and the difficulty and complexity of legal issues as well as the appropriate amount of time billed for various legal tasks. *Pettibone*, 74 B.R. at 306; *See In re Liberal Market, Inc.*, 24 B.R. 653, 657 (Bankr.S.D. Ohio 1982). The court may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment as to

value. *In re WHET, Inc.*, 61 B.R. 709, 713 (Bankr.D.Mass.1986).

A series of judicial decisions under the former Bankruptcy Act held that the compensation of attorneys in bankruptcy proceedings was subject to the overriding concern, unique to bankruptcy cases, of preserving the estate. *Pettibone*, 74 B.R. at 306. The effect of the later amendment to Section 330(a), that compensation be commensurate with that awarded in nonbankruptcy matters, was to overrule those cases. *Id.* That is, economy of administration was eliminated as a standard. *In re NuCorp Energy, Inc.*, 764 F.2d 655 (9th Cir.1985); *see Pettibone*, 74 B.R. at 306.

■ Under the present Code, compensation must be sufficient in amount to induce competent counsel to undertake bankruptcy matters. *Pettibone*, 74 B.R. at 306. The Eighth Circuit has instructed that Section 330:

> . . . is meant to encourage high standards of professional legal practice in the bankruptcy courts. Bankruptcy courts are no longer bound by pre-code notions of frugality and economy in fixing fees. Bankruptcy courts must consider whether the fee awards are commensurate with fees for professional services in nonbankruptcy cases, thus providing sufficient economic incentive to practice in the bankruptcy courts.

*Mann v. McCombs (In re McCombs)*, 751 F.2d 286, 288 (8th Cir.1984); *see In re Atlas Automation, Inc.*, 27 B.R. 820, 822 (E.D.Mich.1983); *see also In re Hanson*, No. 386–00136 at 2 (Bankr.D.S.D. Mar. 8, 1989), 1989 WL78596. The award of fees is within the discretion of the bankruptcy court. *McCombs*, 751 F.2d at 287. However, despite the change made by Section 330(a), the services rendered must still be actual and necessary. *In re Shades of Beauty, Inc.*, 56 B.R. 946, 951 (Bankr.E.D.N.Y. 1986). Though economy of estate is no longer a standard, it does not follow that the legal engine may always operate at full throttle. *Pettibone*, 74 B.R. at 306.

■ The burden of proof to show entitlement to fees is, in all fee matters, always on the applicant. *In re Lindberg Prod-*

*ucts, Inc.,* 50 B.R. 220, 221 (Bankr.N.D.Ill. 1985); *In re Harman Supermarket, Inc.,* 44 B.R. 918, 920 (Bankr.W.D.Va.1984); *In re Horn & Hardart Baking Co.,* 30 B.R. 938, 939 (Bankr.E.D.Pa.1983); *see Pettibone,* 74 B.R. at 299. This burden is not to be taken lightly, especially given that every dollar expended on legal fees results in a dollar less that is available for distribution to the creditors or use by the debtor. *In re Hotel Associates, Inc.,* 15 B.R. 487, 488 (Bankr.E.D.Pa.1981); *see Pettibone,* 74 B.R. at 299.

■ Even if no objections are raised to a fee request, the bankruptcy court is still not bound to award the fee as prayed. *Pettibone,* 74 B.R. at 299. Indeed [the] court has the independent authority and responsibility to determine the reasonableness of all fee requests, regardless of whether objections are filed. *In re NRG Resources, Inc.,* 64 B.R. 643, 650 (W.D.La. 1986); *In re Esar Ventures,* 62 B.R. 204, 205 (Bankr.D.Haw.1986); *In re Jensen–Farley Pictures, Inc.,* 47 B.R. 557, 585 (Bankr.D. Utah 1985); *In re Wilson Foods Corp.,* 36 B.R. 317, 320 (Bankr.W.D.Okla. 1984).

■ Bankruptcy Rule 2016 requires that in order to meet this burden, the applicant must file with the court an application "setting forth a detailed statement of (1) the services rendered, time expended and expenses incurred, and (2) the amounts requested." In addition, a proper fee application must list each activity, its date, the attorney who performed the work, a description of the work performed or subject matter of the work, and the time spent on the work. *Lindberg,* 50 B.R. at 221–22; *see Pettibone,* 74 B.R. at 301.

■ An attorney claiming reimbursement from the estate for expenses incurred in the case must likewise furnish enough specificity for the court to establish whether a given expense was both actual and necessary under 11 U.S.C. § 330(a)(2). *See In re S.T.N. Enterprises, Inc.,* 70 B.R. 823, 834 (Bankr.D.Vt.1987). Only fully documented, actual out-of-pocket expenses will be reimbursed. *In re Seneca Oil Company,* 65 B.R. 902, 912 (Bankr.W.D.Okla.

1986); *In the Matter of Union Cartage Company,* 56 B.R. 174, 178 (Bankr.N.D. Ohio 1986); *In re Thacker,* 48 B.R. 161, 165 (Bankr.N.D.Ill.1985); *In re Tolan,* 41 B.R. 751, 756 (Bankr.M.D.Tenn.1984); *see S.T.N. Enterprises,* 70 B.R. at 834.

### B. Out–of–State Hourly Rates vs. Local Hourly Rates

In general, a reasonable hourly rate would be the ordinary fee "for similar work in the community." *Johnson,* 488 F.2d at 718; *see Avalon Cinema Corp. v. Thompson,* 689 F.2d 137, 140 (8th Cir. 1982). "The term reasonable hourly rate has been defined as 'the hourly amount to which attorneys in the area would typically be entitled for a given type of work on the basis of an hourly rate of compensation.'" *Jorstad v. IDS Realty Trust,* 643 F.2d 1305, 1313 (8th Cir.1981), *quoting City of Detroit v. Grinnell Corp.,* 495 F.2d 448, 471 (2d Cir.1974); *see Avalon,* 689 F.2d at 140. This does not mean that out-of-town counsel must always be limited to lower local rates. *Id.* It may not always be possible to find counsel in or near the locality of the case who are able or willing to undertake difficult and controversial ... litigation. *Avalon,* 689 F.2d at 140. The court in *Donaldson v. O'Connor* stated that "if a plaintiff can show that he has been unable through diligent, good faith efforts to retain local counsel, attorney's fees under 42 U.S.C. § 1988 are not limited to the prevailing rate in the district where the case is tried." 454 F.Supp. 311, 315 (N.D.Fla.1978). Again in *Ramos v. Lamm,* 713 F.2d 546 (10th Cir.1983), the Tenth Circuit recognized that in unusual circumstances, attorneys should be allowed to charge fees based on the rates charged by them in their normal areas of practice. *See In re Frontier Airlines, Inc.,* 74 B.R. 973, 977 (Bankr.D.Colo.1987). The court in *Frontier Airlines* agree[d], and ... confirm[ed] that proposition in *In re Hans B. Cantrup, Debtor,* 53 B.R. 104 (Bankr.D. Colo.1985), and [held] that it [was] acceptable for the court to award attorney's fees based on the rates charged by the attorney in the locale where he ordinarily practices.

*Frontier Airlines,* 74 B.R. at 977; *see also In re Jensen–Farley,* 47 B.R. 557 (Bankr.D. Utah 1985); *Matter of Baldwin United Corp.,* 36 B.R. 401 (Bankr.S.D. Ohio 1984); *In re Wilson Foods Corp.,* 36 B.R. 317 (Bankr.W.D.Okla.1984.) In fact, the court in *Baldwin* suggested that limiting rates to those charged by Cincinnati bankruptcy lawyers would be "a position too capricious and parochial to withstand analysis under [11 U.S.C.] § 330." 36 B.R. at 402.

### C. Travel Time

The published cases vary widely in the compensation allowed for reasonable and necessary travel time. *Hanson, supra,* at 3. Some courts allow a reduced rate, *In re S.T.N. Enterprises, Inc.,* 70 B.R. 823 (Bankr.D.Vt.1987), *citing In re Taylor,* 66 B.R. 390, 397 (Bankr.W.D.Pa.1986), and *In re Watson Seafood and Poultry Co., Inc.,* 40 B.R. 436, 443 (Bankr.E.D.N.C.1984); *see Hanson, supra,* at 3, some courts have set a flat rate, such as $40.00 per hour, *In re Amatex Corp.,* 70 B.R. 624, 627 (Bankr.E. D.Pa.1985) (the court indicated that greater compensation might be awarded if legal services were performed during travel), or have allowed the full hourly rate. *Frontier Airlines,* 74 B.R. at 978–79; *see Hanson, supra,* at 3.

In the District of South Dakota, the geographic locations of the court points does not always coincide with the attorney's residence, and the concession must be made that substantial travel time is often necessary. *Hanson, supra,* at 3. Also, because a limited number of attorneys in our district practice bankruptcy law, the debtor's ability to hire qualified counsel would be duly chilled if travel was not fully compensable. *Id.* Accordingly, professionals should be compensated at their full reasonable hourly rate for necessary travel hours, unless the travel fees become too large of a percentage of the total fees applied for, exclusive of expenses and sales tax. *Id.*

This result is proper because frugality is no longer the main objective, and full compensation is generally available for travel in other cases "other than in a case under" title 11.[3] *Id. See* Section 330(a); *McCombs,* 751 F.2d 286 (8th Cir.1984). On the other hand, trimming fees in cases where they become too large a percentage of the total fees applied for helps maintain the balance this Court spoke of in *In re Henning,* 55 B.R. 682, 684 (Bankr.D.S.D.1985) (*Henning II*).[4]

### Paraprofessional Billing

If paralegal work is to be compensable, the qualifications of the assistant should be established to justify the charge. *Hanson, supra,* at 5. While legal secretaries acquire vast knowledge of the subject matter and are certainly an integral part of any law office, their service is considered one of many items that make up the cost of office overhead which in turn is reflected in the hourly rate charged by the attorney. *Id.* Simply classifying a secretary as a paralegal for billing purposes does not justify compensating secretary time. *Id.*

## II. ATTORNEYS' FEE APPLICATIONS

### A. James S. Mitchell and the Baird Law Firm

Upon review of Mitchell's fee application, the evidence presented at the hearing, and

---

3. This holding should not be viewed as conflicting with the district court's *Doyle–Lunstra* decision. *In re Doyle–Lunstra Sales Corp.,* 19 B.R. 1003 (D.S.D.1982). In that case, Judge Nichol ruled that "routine and ministerial" services "should be compensated at a lower rate than truly legal services...." *Id.* at 1007. Although travel may not be a "truly legal service," it may be performed only by the professional person traveling, assuming the matter necessitating the travel is of a nature that only the professional could handle it. *See Hanson, supra,* at 3, n. 3.

4. While preserving the bankruptcy estate is no longer the primary concern in awarding professional fees, this Court has retained economy as a relevant factor. *Hanson, supra,* at 2. This Court determined that a balance must be struck between preserving the estate for creditors and "the need to be generous enough to encourage lawyers and others to render the necessary and exacting services that bankruptcy cases often require." *In re Henning,* 55 B.R. 682, 684 (Bankr.D.S.D.1985), *citing In re Yale Express System, Inc.,* 366 F.Supp. 1376, 1381 (S.D.N.Y. 1973).

the applicable law, this Court concludes that the fees should be awarded as requested in the application. The U.S. Trustee's first objection contends that no premium rates should apply to analyzing a proper award for the services of James S. Mitchell, principal counsel herein. The U.S. Trustee contends that from the start this case had been represented to be and had proceeded in a liquidation mode. They argue that liquidation was a foregone conclusion. The case took over three years to reach its final stage, the sale to the Federal Bureau of Prisons; it took this length of time to find a qualified buyer.

■ The record reflects that this applicant, as well as the other applicants in this case, and the debtor believed that the assets of the estate had an intrinsic value sufficient to pay all creditors. Nonetheless, evidence produced at the fee hearing showed that at various stages in the bankruptcy proceeding where a liquidation, auction-type sale of the assets was contemplated, it was doubtful whether sufficient funds could be raised to pay even the secured creditors. Although the final plan ultimately was a liquidation of assets, it became a liquidation of assets that permitted a 100% payment to all creditors, the payment of all compensation requests, and the retention of $1,000,000–plus for the debtor to do with whatever it pleases. This Court is of the opinion that the premium rates should apply because of the superb job done by counsel in bringing about this outstanding result.

■ The U.S. Trustee's second objection contends that local hourly rate scales should apply to the services performed by Mitchell. The U.S. Trustee argues that this case did not require any unique services available only through an out-of-state firm which could not have been performed by an in-state firm or in-state counsel. They contend that there are a number of firms in South Dakota which have the staff and requisite skill to have competently handled this proceeding, yet local counsel declined to recommend any local firms, electing instead to recommend out-of-state counsel to the debtor.

In this case, the board of trustees for the debtor made the judgment at the outset that it needed the services of a law firm with the capacity, experience, background, and expertise necessary to represent the debtor in a case of this complexity and magnitude. The debtor's board of trustees chose the firm of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, located in Omaha, Nebraska. In charging for its fees, the Baird Firm and Mitchell, as principal counsel and a partner of the Baird Firm, used their normal billing rates which seem to be consistent with rates otherwise charged in the Omaha area but are in excess, somewhat, of the rates charged by bankruptcy practitioners in South Dakota. This Court finds that the Baird Law Firm and James Mitchell should be compensated at their normal hourly rates.

This Court calls attention to the rationale of the Eighth Circuit in the *Avalon* case, which was made mention of earlier in this opinion, when the court stated that "out-of-town counsel must [not] always be limited to lower local rates. It may not always be possible to find counsel in or near the locality of the case who are able and willing to undertake difficult and controversial ... litigation." *Avalon*, 689 F.2d at 140.

Mr. J. Bruce Blake, a very respected and outstanding South Dakota attorney in the area of bankruptcy law, was the only expert witness in this proceeding. He was of the opinion that there very likely would have been a number of local (South Dakota) debtor attorneys who may have accepted employment if requested in December of 1984, but thought that it would have been very doubtful that any of those local attorneys would have continued a case of this complexity and magnitude without quickly hiring outside counsel to assist them. Mr. Blake's rationale was:

> ... that most of the debtor's attorneys in South Dakota, if not all, are either solo practitioners or members of very small law firms. In 1984, if this was not a peak year for bankruptcy work in South Dakota, it was rapidly approaching the peak and most debtor attorneys probably had more work than they could handle at

that time and yet in the nature of the beast of the law practice, of course, when attorneys are contacted by new potential clients, yes, they take the case. It would be most demanding time-wise for a solo practitioner or an attorney in a small law firm, who is already up to capacity with reorganization work or other bankruptcy work, to deal with a case of this magnitude and complexity and with malpractice suits being a normality these days, I believe any of these prospective attorneys would have quickly engaged additional counsel to, if not lead the case, to support him in the case. I am not aware of any debtor attorneys or firms in South Dakota that had the capacity and expertise to represent the debtor in a case of this magnitude and complexity.

This Court, taking into consideration Mr. Blake's testimony along with its own knowledge of debtor attorneys and firms in this state, feels that the debtor could not have found adequate counsel closer to the situs or in this state for substantially less than the rates charged by Mitchell and the other attorneys in the Baird Law Firm. Therefore, Mitchell and the Baird Firm's hourly rates, ranging from $50.00 (paralegal rate) to $145.00 per hour, will be allowed.

The U.S. Trustee's third objection is that there was unnecessary duplication of legal services between Mitchell and local counsel. This Court feels that much of the duplication, complained of by the U.S. Trustee, was inevitable and even necessary due to the association of principal counsel, Mitchell, with local counsel, thus giving rise to a need to coordinate work between each other. Therefore, it is our opinion that such duplication is expected and is not objectionable.

■ The last objection raised by the U.S. Trustee concerns the hourly rate of payment for the travel time of Mitchell. Mitchell's bill for travel time was approximately $55,000. This Court agrees with Chief Judge Hoyt in his decision in *Hanson* when he held that professionals should be compensated at their full reasonable hourly rate for necessary travel hours, unless the travel fees become too large of a percentage of the total fees applied for. *Hanson, supra,* at 3. After hearing the evidence and reviewing Mitchell's fee application, it is my opinion that all the travel fees were necessary. When it was possible, Mitchell did his work by way of the telephone and by mail and, therefore, avoided any unnecessary travel. It is also this Court's opinion that the amount of travel fees is not too large of a percentage of total fees applied for. As a result of these findings, Mitchell will receive his full hourly rate for his travel time in this case.

■ Having concluded that the U.S. Trustee's objections are not persuasive, the Court turns to a review of the reasonableness of Mitchell's fee request under the guidelines of Section 330, the lodestar approach, and the twelve *Johnson* factors. After reviewing the fee application, the evidence presented at the hearing, and the applicable law, the Court finds that Mitchell's fee request is reasonable. The Court, in making its decision, found the following with respect to the *Johnson* factors:

(1) there was a considerably large amount of time and labor involved which was necessary to produce the result obtained;

(2) that there were some novel and difficult questions that had to be dealt with, including coordination with a new charitable entity seeking to re-open the College, negotiations with a federal agency for purchase of the assets, and attendance to local election matters dealing with that purchase, just to name a few;

(3) that this case required a high degree of skill and Mitchell fulfilled this requirement by using his expertise to preserve the assets of the debtor until a suitable buyer could be found;

(4) due to the length of this case, Mitchell was precluded from taking on other cases;

(5) there was no fixed or contingent fee agreement, but the fees were very contingent in that there was no guar-

antee that there would be enough money to pay the attorney fees;

(6) the result obtained was an outstanding one in that all creditors were paid 100% and there was $1,000,000–plus left over;

(7) the experience and ability of Mitchell are a reflection of the outstanding result achieved;

(8) that Mitchell, attendant to the needs of the debtor and others, had gone for a lengthy period of time without compensation; and

(9) with the possible exception of the recent *Midwest Educational Systems* case, there probably are no similar cases within this district. *Midwest Educational Systems, Inc.*, Ch. 11 Case No. 87–50288 (Bankr.D.S.D. filed Oct. 23, 1987).

Another factor considered by the Court was that the president of the College, Don Peterson, who worked very closely with each of the attorneys in this Chapter 11 bankruptcy, reviewed Mitchell's fee application and indicated a wholehearted support of the application.

### B.   *John R. Kabeiseman and the Brady Law Firm*

The U.S. Trustee first challenges that Kabeiseman's request for allowance of attorney fees for the period November 20, 1984–July 29, 1987, at the rate of $110.00 per hour is excessive and should be reduced. Also, that Kabeiseman's request for allowance of attorney fees for the period August 5, 1987–December 31, 1987, at the rate of $125.00 per hour is excessive and should be reduced. The U.S. Trustee has asked that the hourly rates be reduced to $85.00 per hour.

J. Bruce Blake, the bankruptcy expert at the fee application hearing, told the Court that "he typically charges $80.00 per hour in the typical farm reorganization case, $100.00 per hour for a non-farm reorganization case, and in the most difficult and complex reorganization cases, such as the *Midwest Educational Systems, supra,* case, $125.00 per hour."

The Court is aware of the hourly rates charged by bankruptcy attorneys in this state. The Court is of the opinion that the rates stated to the Court (Blake's rates) are accurate as to the bankruptcy rates generally charged in South Dakota.

■ After reviewing the fee application, the evidence presented, and the applicable law, the Court finds that Kabeiseman's hourly rate, both the $110.00 and $125.00 rates, should be reduced to $100.00 per hour. The Court in making its decision found that, although Kabeiseman had some experience in the bankruptcy field, he was by no means a specialist in this area of law and, therefore, should not be allowed to charge specialist rates. The experience of the applicant was not the only consideration. The Court also considered the complexities of this case as well as the outstanding result, and that is why a reduction of the applicant's hourly rate to $100.00 per hour, instead of $85.00 per hour as requested by the U.S. Trustee, was made.

The U.S. Trustee's next objection contends that Kabeiseman's revised billing statement is based, at least in part, on his comparative review of companion billing statements filed by debtor's principal counsel, Mitchell, and Humphrey, the attorney for the UCC. The U.S. Trustee argues that the revised application is based on third-party information and is not entirely the product of the actual records of Kabeiseman made contemporaneous with performance of the claimed services and, therefore, has serious reservations as to the reliability of the entries provided in the revised billing statement.

After reviewing Kabeiseman's fee application and billing statements and listening to the testimony of the witnesses at the fee application hearing, the Court finds that Kabeiseman's revised billing statement accurately reflects the services performed by him as local counsel for the debtor. The Court's decision here is based on the fact that all three applicants worked in conjunction with one another on almost everything involved in this bankruptcy, and, as a result of this, the Court felt that it would be quite possible to reconstruct one's records

accurately by comparing the billing records of the three applicants.

The U.S. Trustee's last objection is that of unnecessary duplication of legal services between Kabeiseman, local counsel, and Mitchell, principal counsel. The Court finds that such duplication is not objectionable consistent with the rationale used in deciding the same objection in regard to Mitchell's fee application.

■ The Court now turns to a review of the reasonableness of Kabeiseman's fee request under the guidelines of Section 330, the lodestar approach, and the twelve *Johnson* factors. Upon review of the fee application, the testimony and evidence presented, and the applicable law, the Court will find that Kabeiseman's fee request is reasonable. The Court in making this determination found the following with respect to the *Johnson* factors:

(1) the time and labor involved was reasonable and was necessary to bring about the magnificent outcome which resulted;

(2) the ultimate course of the proceedings led to several novel and difficult issues, including marketing efforts seeking to find a new buyer to reopen the College, negotiations with the Federal Bureau of Prisons for the sale of the College for a minimum security level prison, and attendance to local election matters dealing with that sale;

(3) significant skill was used to successfully negotiate the resolution of many claims without the need for litigation, to maintain the College as an entity able to preserve its assets, and to avert requests for involuntary liquidation which occurred at several points in this case;

(4) due to the longevity of this case, this applicant was prevented from taking on other legal work;

(5) there was no contingent fee agreement, but that the fees were contingent in that it was very possible that there would not be enough money (left over after liquidation of the assets) to pay the attorney fees of the applicants;

(6) the outcome was phenomenal in that all creditors were paid in full and there was over $1,000,000 left after all claims were paid;

(7) that Kabeiseman's reputation and ability as an attorney helped to obtain the local support needed for the purchase by the Federal Bureau of Prisons;

(8) that Kabeiseman, attendant to the needs and concerns of the debtor, went for a lengthy period of time without being compensated;

(9) at various stages of this case, time pressures were acute;

(10) as the College was such an important part of the small community of Yankton, there was a potential for undesirability if the results turned to be less than favorable; and

(11) with the possible exception of the recent *Midwest Educational Systems, supra,* case, there probably are no similar cases within this district.

Again, as with the Mitchell application, the Court considered the fact that Don Peterson, president of the College, after reviewing Kabeiseman's fee application, gave his approval and support of the application.

### C. *David C. Humphrey*

■ The U.S. Trustee's first objection to Humphrey's fee application is to the applicant's request for allowance of $8,060.00 for paralegal services. They contend that broadly accepted standards for billing fees, legal or paralegal, require at a minimum that specific time entries be provided along with an adequate explanation as to the nature of the services performed. They argue that in comparison to the above-stated standard, Humphrey provides only a three-page statement notating paralegal hours billed from month-to-month through the term of this case.

The Court agrees with the U.S. Trustee and finds that the billing statement of Humphrey is not only devoid of any specificity as to a time the purported paralegal

service is rendered, but it also lacks any explanation whatsoever of the nature of the service itself. The Court, in accordance with Chief Judge Hoyt's decision in *Hanson*, also suggests to the applicant that in order to be compensated for paralegal services, he must, somehow, establish that person's qualifications, as a paralegal, to justify the charge. Perhaps submitting a resume, as to that person's qualifications, to the U.S. Trustee's office would suffice. On the basis of the above analysis, applicant's fee application, evidence presented, and applicable law, the Court will find that $8,060.00 billed by Humphrey for paralegal services is denied.

The U.S. Trustee's second objection to Humphrey's fee application is that his request for allowance of attorney's fees at a rate of $100.00 per hour is excessive and should be reduced to $75.00 per hour. They contend that what is customary for a given applicant must be consonant with his overall experience in the field. They argue that Humphrey is not an experienced bankruptcy attorney. They also argue that no bonus, in excess of hourly rate allowed, should be permitted. The applicant has asked for a 25% enhancement of his fees (an extra $25.00 per hour). We will deal with the applicant's request for the enhancement later in this opinion.

█ In the testimony given at the fee application hearing, the applicant admitted that he had very little bankruptcy experience, but the Court also learned that he had extensive experience as counsel in some large corporate cases. Humphrey's extensive experience became a very valuable asset to this case as it was not one which called for bankruptcy experience only. It was a workout, requiring negotiation and other related skills. Upon review of the fee application, Mr. Blake's testimony and other evidence presented at the hearing, and the applicable law, the Court finds that Humphrey's hourly rate of $100.00 per hour is approved and will not be reduced. The Court, in making its decision, considered other factors such as the extremely complex nature of this case and,

most importantly, the phenomenal result of this case.

█ The U.S. Trustee's next objection is that an excessive amount of time, 92.83 hours, is billed for reviewing creditors' claims. They argue that 92.83 hours amounts to almost 25% of the applicant's time spent on the case. The Court finds that this objection is without merit. When comparing the 92.83 hours with the number of creditors (over 900), that works out to be about six minutes per claim. The number of hours billed for reviewing claims, we feel, is very reasonable.

The last objection made by the U.S. Trustee is that Humphrey's fee application is inadequately documented. They argue that Humphrey's fee application is based on companion billing statements of Mitchell and Kabeiseman and is not entirely the product of the actual records of the applicant made contemporaneous with performance of the claimed services and, therefore, have serious reservations as to the reliability of the entries provided in the billing statement.

The Court will find, as it did on the objection to Kabeiseman's billing statement, that the billing statement and fee application of the applicant accurately reflect the services performed by him as counsel for the UCC. The Court's rationale is the same as that stated in the analysis of the Kabeiseman application.

█ The Court now turns to a review of the reasonableness of Humphrey's fees under Section 330, the lodestar approach, and the twelve *Johnson* factors. After reviewing the fee application, the testimony and evidence presented at the hearing, and the applicable law, the Court will find that Humphrey's fee request is reasonable. The Court in making its decision found the following with respect to the *Johnson* factors:

(1) The time and labor expended was appropriate under the circumstances. 11 U.S.C. § 1103(c) sets forth what in effect are the obligations of the attorney for the UCC. Satisfaction of Code responsibilities is certainly an

appropriate expenditure of time and effort. Specifically with reference to the objection concerning the review of creditor claims, the amount of time was appropriate in light of the great number of creditors involved. From a broader perspective, the final resolution was not in clear view until the very end. The vulnerability of the unsecured creditors' claims required pursuit of all credible alternatives to quick liquidation. There were many dead ends, but even those efforts which did not produce tangible results were not wasted, because the effort itself kept the reorganization going. Public perception was important and the public support proved to be an important factor in the decision of the Bureau of Prisons to purchase the facility.

(2) Certainly the circumstances of this case were novel, although the questions presented were not strictly legal. Because of immediate pressures and time constraints, the plan had to be formulated often without a complete understanding of all the variables and implemented in light of constantly changing circumstances. The working out of a delicate and protracted reorganization while under intense public pressure and scrutiny was a unique and novel circumstance.

(3) The requisite skills were judgment, negotiation, accommodation, trust, and patience. This was an extended workout which, although under the protection of the bankruptcy court, had to of necessity avoid the court and work on the basis of consensus and trust. Local politics played a large role in the process, threatening at times to kill the venture and in the end supplying a key ingredient in the decision to purchase. Humphrey and the rest of the reorganization team were key players in the local political scene.

(4) This was obviously a case with a major impact on Humphrey's practice and his ability to accept other work. It also had the potential for highly visible failure which could have had a significant effect on his practice in Yankton.

(5) The fee in this case in a very real sense was contingent. Fees awarded under Section 330(a) are treated as administrative expenses and are entitled to a priority under Section 507(a)(1). But there was no guarantee that even the priority unsecured claims would be paid in this case. In the likely event of a liquidation on a piecemeal auction basis, it was unlikely that the fees would have been paid.

(6) Because of the crisis facing the College in terms of winding up the academic program, ascertaining the true state of its financial difficulties, securing the assets, and controlling the debt, there were demands for priority time which Humphrey gave. There were other periods of time priority throughout the process because the operation was always fragile and the potential opportunities were often fleeting.

(7) The results, particularly from the standpoint of the members of the UCC, were outstanding. What began as a potential and, at times seemingly inevitable, no asset or low asset case wound up as a full payment case. The result was not foreordained, as suggested by the U.S. Trustee, but instead required extraordinary skill, judgment, and patience.

(8) Humphrey is an experienced attorney, able to function well in a setting requiring consensus, able to deal with novel circumstances and ambiguity, and willing to follow through on his judgment. The U.S. Trustee seems to believe that one must be a member of the "bankruptcy club" before earning compensation in the amount requested by Humphrey. It should be remembered that although this was a bankruptcy case, it was not one calling primarily for bankruptcy skills. It was a workout, requiring negotiation and other related skills. In fact, the success was dependent, in part,

upon keeping the case out of the bankruptcy court. Of particular importance also was Humphrey's expertise in government grant programs and services because the initial priority claim of the federal government for $2.9 million posed a substantial problem for the unsecured creditors as well as for the feasibility of a reorganization.

(9) This case had the potential for undesirability if it had failed. That is, there was some risk of a public failure with plenty of opportunity for blame and possibly retribution.

(10) The nature of the professional relationship was particularly admirable. By common agreement, all counsel served without compensation for an exceptionally long period of time. This was done in the interest of giving the reorganization a chance to succeed. A request of funds on an interim basis would have eased the financial burden on the attorneys but increased the burden on the College. The placing of client interests above personal interests is a result often praised in theory but not always realized in practice nor recognized by the courts.

(11) With the possible exception of the recent *Midwest Educational Systems, supra,* case, there, probably, are no similar cases within this district.

Again, as with both the Mitchell and Kabeiseman applications, we considered the fact that Don Peterson, president of the College, after reviewing Humphrey's fee application, gave his approval and support of the application.

### III. FEE ENHANCEMENT

█ Most courts [have] assumed that the hybrid approach (the combining of the lodestar approach with some of the *Johnson* factors) (mentioned earlier in this decision) would allow for a bonus in cases where one or more of the appropriate factors was found to be applicable. *Schaeffer,* 71 B.R. at 562; *see, e.g., In re*

*Penn–Dixie Industries, Inc.,* 18 B.R. 834, 838–39 (Bankr.S.D.N.Y.1982); *In re Aminex Corp.,* 15 B.R. 356, 362 (Bankr.S.D.N.Y.1981). However, in a recent series of cases, the [United States] Supreme Court appears to have significantly tightened the standard for awarding a premium in excess of the lodestar amount. *Schaeffer,* 71 B.R. at 562. The first in this series was *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a civil rights case in which the [C]ourt held that while the factors developed by the Fifth Circuit might be considered in setting fees, the lodestar amount subsumed many of those factors, *Hensley,* 461 U.S. at 434, n. 9, 103 S.Ct. at 1940, n. 9; *see Schaeffer,* 71 B.R. at 562, but in some cases of exceptional success an enhanced award may be justified. *Blum v. Stenson,* 465 U.S. 886, 897, 104 S.Ct. 1541, 1548, 79 L.Ed.2d 891 (1984), *citing Hensley,* 461 U.S. at 435, 103 S.Ct. at 1940. Then came *Blum v. Stenson,* 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), which held that factors such as complexity of the case, skill of counsel, and results obtained were all built into the hourly rate used to calculate the lodestar amount, and that a premium above that amount should be awarded only where the court makes a detailed finding based upon specific evidence establishing rare and exceptional [success]. *See Schaeffer,* 71 B.R. at 562–63.

Finally, in *Pennsylvania v. Delaware Valley Citizens' Council,* 478 U.S. 546, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986) (*Delaware Valley I*), an environmental case, the [C]ourt found a "strong presumption that the lodestar figure ... represents a reasonable fee," and concluded that:

"... the lodestar figure includes most, if not all, of the relevant factors comprising a 'reasonable' attorney's fee, and it is unnecessary to enhance the fee for superior performance...."

*Delaware Valley I,* 106 S.Ct. at 3098. The Court specifically reserved the question for later argument whether the lodestar might be enhanced "based on the likelihood of success, or to put it another way, the risk of loss." *Id.* at 3099. The Court returned to that question in *Pennsylvania v. Dela-*

ware Valley Citizens' Council, 483 U.S. 711, 107 S.Ct. 3078, 97 L.Ed.2d 585 (1987) (*Delaware Valley II*). Four justices in *Delaware Valley II*, based upon the evidence presented in that case, concluded that risk of loss could not serve as an enhancement factor, *id.* at 3086–89 (White, J., with whom Rehnquist, C.J., and Powell and Scalia, J.J., joined); *see Gilbert v. The City of Little Rock*, 867 F.2d 1063, 1077 (8th Cir.1988), but they did not rule out "risk of loss" as an enhancement factor completely. *Id.* 107 S.Ct. at 3088. The Court in *Delaware Valley II* stated the following:

> [W]e deem it appropriate, in order to guide the exercise of the trial courts' discretion in awarding fees, to adopt here the approach followed in *Blum* in dealing with other multipliers. As in that case ... enhancement for the risk of nonpayment should be reserved for exceptional cases where the need and justification for such enhancement are readily apparent and are supported by evidence in the record and specific findings by the courts.

*Id.* at 3088. The Court in *Delaware Valley II* also noted that "the risk of nonpayment should be determined at the beginning of the [case]." *Id.* at 3088, *citing Lewis v. Coughlin*, 801 F.2d 570, 576 (2d Cir.1986), and *Ramos v. Lamm*, 713 F.2d 546, 558 (10th Cir.1983).

Justice O'Connor concurred with the four justices in *Delaware Valley II* on the understanding that although risk of loss was not properly applied on the facts before the Court, Congress did not intend to exclude the possibility of enhancing an attorney's fee award because of the risk of loss. *Gilbert*, 867 F.2d at 1077, *citing Delaware Valley II*, 107 S.Ct. at 3089–91 (O'Connor, J., concurring in part and concurring in the judgment).

Echoing the sentiments of the Court in *Delaware Valley II*, the Eighth Circuit in *Gilbert* held that they will not rule out the possibility that the risk of loss could justify enhancement of an award of attorney fees, but that they would require the applicant(s) to demonstrate that enhancement was necessary to attract competent ... counsel in

light of the risk of loss. *Gilbert*, at 1077, *citing Catlett v. Missouri Highway & Transportation Comm'n*, 828 F.2d 1260, 1271 (8th Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 1574, 99 L.Ed.2d 889 (1988); *see also Delaware Valley II*, 107 S.Ct. at 3089.

While this line of cases involved other areas of the law, the principles they established have been embraced by both bankruptcy courts and other courts passing on fees in bankruptcy. *Schaeffer*, 71 B.R. at 563.

Here, the three applicants worked as a team. This team of attorneys, even in light of the high risk of nonpayment, with a tremendous team effort, accomplished a magnificent result. Humphrey, as a member of this team of attorneys, has requested a 25% bonus on top of his requested hourly rate of $100.00 per hour (or $25.00 per hour). Mitchell and Kabeiseman have also argued that a bonus or enhancement may be in order. The three applicants' reasoning for the requested bonus is the complexity of the case, the phenomenal result obtained, and the risk of nonpayment (risk of loss). We know from *Blum* that the complexity and novelty of issues in a case, *Blum*, 465 U.S. at 899, 104 S.Ct. at 1549, and the results obtained are usually not a proper ground for enhancement. *Blum*, 465 U.S. at 900–01, 104 S.Ct. at 1549–50; *see Schaeffer*, 71 B.R. at 562. Again, in *Delaware Valley I*, the United States Supreme Court concluded that complexity of a case and superior results obtained were subsumed in the lodestar figure and the *Johnson* factors. *Delaware Valley I*, 106 S.Ct. at 3098.

On the other hand, *Blum* [left] open the possibility that the risks assumed by counsel in taking a case can be a ground for enhancement. *Blum*, 465 U.S. at 901 & n. 17, 104 S.Ct. at 1550 & n. 17. In *Blum*, no enhancement on account of risk was allowed, because the district court, the court whose fee award was contested in that case, had no basis in the record for finding that any particular risk had been assumed. *Craik v. Minnesota State University Bd.*, 738 F.2d 348, 350 (8th Cir.1984).

The Court finds that the circumstances of this case justify an enhancement of the applicants' award of attorney fees.

The Court's finding is that from the start, it was apparent that Yankton College was a valuable asset to both the Community of Yankton and the State of South Dakota. The applicants were well aware that this case was likely to be a lost cause, meaning that there was very little likelihood that the College could be salvaged. Yet the applicants marched on as the last hope that something constructive could be done with the College. The applicants, well aware that this bankruptcy would require massive amounts of time and energy, willingly and knowingly made a substantial investment of their time with very little prospect of recompense. This case began as a no asset case and wound up as a full payout case with a surplus of over $1 million, a truly outstanding result. From the beginning, it seemed very likely that, upon a gavel sale-type liquidation, the assets of the College would bring a value barely sufficient to pay the secured creditors, therefore, leaving little or no money to pay the unsecured creditors as well as the fees of the applicants. The risk here went beyond the typical contingent fee arrangement. In all three of the applicants' cases, a very substantial amount of their professional time between December of 1984 and December of 1987 was expended on this case. The investment of that much time out of their law practices, with very little prospect of compensation if the reorganization could not be kept alive until a buyer for the whole campus (land, buildings, and personal property) could be located, is, indeed, a major risk, one the Court finds is sufficient to support an enhancement of the applicants' fee awards. The Community of Yankton, the State of South Dakota, and the debtor were in need of just such service to bring about an absolutely phenomenal result. The Court finds that this is a unique case where the need and justification for such enhancement are readily apparent and are supported by the evidence in the record and considered by this Court.

## IV. CONCLUSION

Accordingly, based on the foregoing, this Court will find that the following hourly rates, hours, and expenses are reasonable and should be allowed. Also, this Court has decided to allow an enhancement of 15% to be added to each applicant's fee award. The hourly rates allowed and the award of fees and expenses are made as follows:

For Mr. Mitchell and the Baird Law Firm:

|  | Hourly Rate Requested | Hourly Rate Allowed |
|---|---|---|
| **Partners:** | | |
| Clarke | $125.00 | $125.00 |
| Clatterbuck | $120.00 | $120.00 |
| Mitchell | $145.00 | $145.00 |
| Sullivan | $125.00 | $125.00 |
| Jensen | $125.00 | $125.00 |
| **Associates:** | | |
| Callahan | $ 60.00 | $ 60.00 |
| Hawekotte | $115.00 | $115.00 |
| Palomar | $ 70.00 | $ 70.00 |
| Swick | $ 75.00 | $ 75.00 |
| **Paralegals and Clerks:** | | |
| Lomax | $ 50.00 | $ 50.00 |
| Phillips | $ 50.00 | $ 50.00 |
| Morse | $ 50.00 | $ 50.00 |
| Vankat | $ 50.00 | $ 50.00 |
| Jones | $ 50.00 | $ 50.00 |
| Pennell | $ 50.00 | $ 50.00 |

There was a total of 3,041 hours of work done by Mr. Mitchell and the rest of the Baird Law Firm. The total amount of fees allowed is $393,900.10. The total amount of expenses allowed is $23,835.17. The total amount of fees and expenses allowed equals $417,735.27. The enhancement of 15%, added to the total amount of fees and expenses allowed, equals a grand total of $480,335.56. The interim compensation and reimbursement of expenses in the amount of $296,228.00, which has already been paid, shall be subtracted from the grand total mentioned above. Also, a retainer in the amount of $3,462.11, which was paid to Mitchell, will be subtracted from the grand total accordingly.

For Mr. Kabeiseman and the Brady Law Firm:

|  | Hourly Rate Requested | Hourly Rate Allowed |
| --- | --- | --- |
| Brady Law Firm | $110.00 | $100.00 |
| Kabeiseman (after leaving the firm) | $125.00 | $100.00 |

There was a total of 952.25 hours worked by the Brady Law Firm and Mr. Kabeiseman. The total amount of fees allowed is $95,225.00. The total amount of expenses allowed is $4,127.45. The total amount of fees and expenses allowed equals $99,352.45. The enhancement of 15%, added to the total amount of fees and expenses allowed, equals a grand total of $114,255.32. The interim compensation and reimbursement of expenses in the amount of $56,365.00, which has already been paid, shall be subtracted from the grand total of $114,255.32 accordingly.

For Mr. Humphrey:

|  | Hourly Rate Requested | Hourly Rate Allowed |
| --- | --- | --- |
| Mr. Humphrey | $125.00 (including the $25.00– per–hour requested bonus) | $100.00 |

There was a total of 620.26 hours worked by Mr. Humphrey. The total amount of fees allowed is $62,026.00. The total amount of expenses allowed is $2,963.11. The total amount of fees and expenses allowed equals $64,989.11. The enhancement of 15%, added on to the total amount of fees and expenses allowed, equals a grand total of $74,737.48. The $8,060.00 Humphrey requested for paralegal fees is denied pursuant to the Court's discussion of paralegal fees earlier in this decision. The interim compensation and reimbursement of expenses in the amount of $18,047.50, which has already been paid, shall be subtracted from the grand total of $74,737.48 accordingly.

This Memorandum Decision constitutes the Court's Findings of Fact and Conclusions of Law in the above-entitled matter pursuant to Bankr.R.P. 7052 and 9014 and Fed.R.Civ.P. 52. Counsel for each of the fee applicants are directed to submit a proposed order, consistent with the Court's Findings of Fact and Conclusions of Law and in accordance with Bankr.R.P. 9021, to the Clerk of this Court. Also, the orders are to include counsel for applicants as joint payees.