**In the Matter of BALDWIN UNITED CORPORATION, D.H. Baldwin Company, et al., Debtors.**

**Bankruptcy No. 1–83–02495.**

United States Bankruptcy Court, S.D. Ohio, W.D.

Jan. 20, 1984.

Robert White, Linda Smith, O'Melveny & Meyers, Los Angeles, Cal., for debtors in possession.

## ORDER

RANDALL J. NEWSOME, Bankruptcy Judge.

These Chapter 11 cases are before the Court pursuant to the motion of the debtors-in-possession to establish the "basis for determining the cost of comparable services" under Section 330 of the Bankruptcy Code.

This motion was inspired in large measure by comments made by this Court at a brief status hearing held not long after these cases were filed. At that time the Court stated that appropriate fee standards should be set at an early stage of these proceedings. Both fairness and sound judicial administration dictate that the parties and their counsel be given some measure of certainty regarding this matter from the outset, rather than at a later time after large quantities of time and effort have been expended.

The sole issue before the Court is whether the starting point for judging awards of professional compensation in these cases should be the prevailing hourly rate charged for like services in Cincinnati, or the customary hourly rate the professional charges for such services in his or her private practice.

A brief description of the debtors and their difficulties is required to put this issue in its appropriate context. To characterize the Baldwin-United Corporation as merely a "holding company" is to grossly understate its complexity. It is in fact a crazy quilt of four holding companies which hold other holding companies which in turn hold subsidiaries. There are 214 such entities altogether. The Baldwin-United Corporation ("BU") is the holding company for all

of the holding companies. One of its subsidiaries is Baldwin-United Leasing Co. ("BUL") which in turn holds certain shell companies. D.H. Baldwin Co. ("DHB"), the second major holding company, indirectly holds Balunit, Inc., the third major holding company, which in turn holds M.G.I.C. Investment Co., the fourth major holding company. Balunit and M.G.I.C. Investment are not in bankruptcy.

At least 25 different securities were issued by these entities, 13 of which are publicly traded. As of December, 1982 the consolidated balance sheets for BU and all of its holdings showed assets of over $9.3 billion and liabilities of nearly $8.9 billion. According to the schedules filed in this Court, BU alone has debts and property totaling approximately $315 million and $56 million, respectively; DHB alone has debts and property totaling approximately $648 million and $106 million, respectively.

The complexity of the corporate structure is magnified by numerous inter-company transfers of assets and liabilities, the extent of which has yet to be fully revealed. Stock in some of the corporate entities is held by companies located both upstream and downstream on the corporate flow chart. By all accounts, these bankruptcy cases may well be the largest ever filed in the United States. They are at least the most complex cases ever filed.

The magnitude of the legal and financial problems facing these companies requires counsel possessing considerable resources and expertise. The law firm of O'Melveny & Myers of Los Angeles, California which has been appointed as the debtors' bankruptcy counsel, has been involved in numerous other large reorganization cases. It is presently serving as co-counsel to the official creditors' committee appointed in *In re Wickes Companies, Inc.,* pending in the Bankruptcy Court for the Central District of California and is representing major creditors in *In re Sambo's Restaurants, Inc.* and *In re Braniff Airways, Inc.* pending in the Bankruptcy Courts of the Central District of California and the Northern District of Texas, respectively. The debtor's general corporate counsel is Debevoise & Plimpton, which represented the Chrysler Corporation in its private debt restructuring. The other professionals which the Court has thus far appointed in these cases are of comparable national prominence in their fields of specialization.

To apply Cincinnati hourly rates for the services these professionals perform might result in attempts to resign from their positions, and might effectively deprive the debtors-in-possession of their expertise and experience. Such a result would not only be a crippling blow to the debtors and their creditors, but would also violate the spirit of the Bankruptcy Code and governing case law.

The notion that professional services performed in a bankruptcy case should be compensated at a lower rate than in other types of cases has been eradicated by the specific language of Section 330 of the Code, which states that reasonable compensation is to be based in part upon "the cost of comparable services other than in a case under this title..." The intent of this section was to overrule cases such as *Massachusetts Mutual Life Insurance Co. v. Brock,* 405 F.2d 429 (5th Cir.1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1748, 23 L.Ed.2d 220 (1969), which required a spirit of economy in awarding fees. *See also, Cle-Ware Industries Inc. v. Sokolsky,* 493 F.2d 863, 868–869 (6th Cir. 1974), *cert. denied,* 419 U.S. 829, 95 S.Ct. 50, 42 L.Ed.2d 53 (1974). Congress made it clear that "[n]otions of economy of the estate in fixing fees are outdated and have no place in [the] bankruptcy code." 124 Cong. Rec. H. 11,091–2 (Sept. 28, 1978); S. 17,408 (Oct. 6, 1978). *In re Hamilton Hardware Co., Inc.,* 11 B.R. 326, 329 (Bkrtcy.E.D.Mich. 1981).

To limit fees to the rates charged by Cincinnati bankruptcy lawyers, merely because these cases happened to be filed in Cincinnati, would be a position too capricious and parochial to withstand analysis under § 330. The reasoning of *In re Atlas Automation, Inc.,* 27 B.R. 820, 822 (Bkrtcy. E.D.Mich.1983) is equally applicable in this case:

Consistent with the new position on fees must be the inference that more experienced practitioners with regional or metropolitan practices should be encouraged to accept appointments in cases filed in less populous communities. It is simply a fact that in a small community like Flint there are just not many Chapter 11 cases filed involving substantial assets and liabilities; in this instance, Atlas Automation dwarfed almost all the other Chapter 11 cases then pending in this unit by the extent of its operations and corporate complexities.

The use of the professional's customary hourly rate as a point of departure in fee awards is also in keeping with the requirements of *Northcross v. Board of Education of Memphis City Schools,* 611 F.2d 624 (6th Cir.1979) and its progeny. The issue of whether to apply "local" or "national" rates was addressed in *Louisville Black Police Officers Organization, Inc. v. City of Louisville,* 700 F.2d 268 (6th Cir.1983), which involved the fee application of non-private attorneys from New York City in a class action civil rights case. While the Court of Appeals found that the District Court's application of the local rates was appropriate under the circumstances, it noted as follows:

> This is not a case in which a private out-of-town practicing attorney has been called in to try a case. In such a situation, the Court would be justified in looking to his or her standard rate in the community where that attorney normally practices as a reflection of that attorney's training, background, expertise and skill ... District Courts are free to look to a national market, an area of specialization market, or any other market they believe appropriate to fairly compensate particular attorneys in individual cases. 700 F.2d at 277–278.

We should emphasize that our holding today merely establishes the starting point for determining fee awards in these cases. A consideration of the other criteria for awarding appropriate compensation under § 330 and *Northcross* must await the filing of applications and the hearings thereon. Nor should this order be read to limit this Court's discretion to determine whether the customary hourly rate of a particular professional is reasonable and appropriate under the circumstances. Such rates may be adjusted depending upon the nature and difficulty of the work performed; whether the work could have been performed by someone with less experience at a lower rate; whether the rate is in line with rates charged by comparable professionals with offices in the same locale as the applicant; and most importantly, whether the value of the services rendered to the debtor justify the rate charged. This list of factors is merely illustrative, not all-inclusive.

Subject to the limitations noted above, the motion of the debtors-in-possession is hereby GRANTED.

IT IS SO ORDERED.