### In re FRONTIER AIRLINES, INC., Debtors.

**Bankruptcy No. 86 B 8021 E.**

United States Bankruptcy Court, D. Colorado.

June 25, 1987.

Carl A. Eklund, John E. Maas, Roath & Brega, Denver, Colo., for debtors.

Michael E. Katch, Katch, Anderson & Wasserman, Denver, Colo., and Leon C. Marcus, Booth Marcus & Pierce, New York City, for the Official Unsecured Creditors' Committee.

## ORDER ON FIRST INTERIM FEE APPLICATIONS

CHARLES E. MATHESON, Bankruptcy Judge.

In the early stages of this case the Court was requested to and did enter an order establishing special procedures for the allowance and payment of interim fees and expenses to professionals and to members of the committees appointed pursuant to 11 U.S.C. § 1102. Under the procedures established the parties were permitted to bill the Debtors ("Frontier") on a monthly basis and Frontier was allowed to pay 75% of the fees requested and 100% of the out-of-pocket expenses, subject to the requirement that within fifteen (15) days following the end of each 3–month period each party who sought reimbursement of expenses or interim compensation must file with the Court an application for approval of the payments actually billed during the preceding 3–month period. In addition, once every six months any professional person who has received interim compensation at 75% of his customary hourly rates may file an application with the Court to receive, as interim compensation, amounts equal to the previously unpaid 25% as special interim compensation.

Pursuant to the procedures established, the professionals filed in December 1986 their requests for approval of the fees which had been paid to them on a monthly basis for the period ending November 30, 1986. Notice of the filing of those fee applications was given as required by 11 U.S.C. § 331 and 11 U.S.C. § 503 and no objection to the fees as requested was filed by any party. The dollar amounts which had been paid and for which approval was sought were substantial. It was and is the Court's view that the Creditors' Committee (the "Committee") is fundamentally the party which should be concerned about the allowance and payment of such fees, since the dollars expended as administrative expenses essentially come out of the pockets of the creditors. Thus, the Court entered a separate order requiring the Committee to review the fee applications and to file a separate report on the recommendations of the Committee concerning the fees and expenses for which approval was sought.

The Committee appointed a special sub-committee to serve as consultants to the Committee to review the fee applications and the Court authorized the employment by the Committee of the members of that sub-committee, in effect, as professionals or consultants to the Committee pursuant to the provisions of 11 U.S.C. § 327. That sub-committee, denominated an "Audit Committee" by the Committee, has now filed its report on the fee allowances sought through November 30, 1986. The report is outstanding in its thorough and professional analysis and evaluation of the voluminous fee applications. Certainly, it represents an analysis which could never have been conducted by this Court, in part, because of the lack of available time and, in large part, because of the ability of the Audit Committee to not only evaluate the applications, but to further investigate and

clarify matters with the applicants when questions arose.

The fee applications of the professionals must be considered in light of Frontier's proceeding. When the Chapter 11 case was filed, Frontier had already shut down its operations. It owned few assets. It had a fleet of leased airplanes and was in possession of various other leased facilities, such as terminal gates, landing slots and hangers. Maintenance of the airplane fleet was inordinately expensive and to preserve any asset values for the creditors, steps to preserve those values had to be taken on an immediate and expedited basis. Unfortunately, the shutdown of operations under circumstances where it was clear that Frontier would not recommence business as an operating airline also meant the loss of many of the employees. The loss of employees, particularly in the middle to upper management levels, created a gap which, in many instances, had to be filled by the efforts of the professionals.

By virtue of extraordinary efforts on the part of Frontier and the various employees and professionals involved, agreements were effected to sell the leased aircraft. That matter was brought before the Court on an expedited basis in October 1986, at which time the application to sell was approved. At the hearings on those motions, the Court took the opportunity to express on the record the Court's recognition of the efforts which had been put forth under extreme time pressures and the results achieved. Without those efforts it is likely that the return to the creditors would have been near zero. As a result of those efforts and others, Frontier is in possession of a multi-million dollar cash estate which has prospects of a significant distribution to the creditors.

Among the problems confronting Frontier was the assertion of United Air Lines ("United") that it was the owner and had the immediate right to possession of the Denver and Dallas gates, the Denver hangers and certain Chicago slots by reason of a purchase made by United in August 1986. Frontier disputed United's rights to the assets and United filed an application for relief from stay asking that it be allowed to go to state court and commence a forcible entry and detainer action to oust Frontier from possession. Since the issues were raised in a Section 362(d) hearing, the matters were brought forward on an expedited basis. Once again, there were enormous efforts by counsel for Frontier, for the Committee and, certainly, for United. There was significant discovery undertaken, many depositions were conducted and documents were exchanged and examined, all on a very short time basis. All of these efforts, and more, have ultimately resulted in the settlement of that litigation with a significant benefit to the estate.

The sale of the airplane leases and the settlement of the United dispute have been the two most significant factors in the administration of Frontier's estate. However, they by no means comprise the whole of the efforts that have been undertaken. In order to effect the sale of the assets, there were multitudinous leases of gate facilities at terminals in many cities across the country. Each lease had to be separately examined and steps taken to assume or reject that lease in order to effect the transfer. There have been disputes with lien claimants against properties, the normal disputes to resolve with utilities, procedures to be established to handle claims, insurance and pension fund problems, separate consideration to the problems dealing with creditors in the estate whose claims have arisen by reason of purchased but unused airplane tickets, etc. All of these various matters had to be focused on in the very early stages of Frontier's proceeding in order to not only effect the sale of the assets, but resolve the litigation with United. In this respect the Frontier case differs somewhat from the normal Chapter 11. In most Chapter 11 proceedings it is difficult to assess in the relatively early stages the benefits that may have been brought to the estate by the efforts of the professionals involved. In this estate, the benefits achieved are, in large part, already manifestly identifiable.

The Audit Committee's report discusses each fee application. However, it also raises questions in certain areas which are

common among some or all of the applications. The Court will address these individually since they pertain not only to the present fee applications, but to the general philosophy of evaluating, applying for and awarding fees in this case. The factors about which concern is expressed are:

1. *Time Keeping Record.* This Court's order establishing the fee procedures in this case set forth guidelines concerning fee applications. Those guidelines admonished the professionals that the monthly statements submitted "should be sufficiently detailed so as to permit identifying the project or tasks performed, the person performing the task and the hours spent by each employee of the firm rendering professional services." That standard was set forth in light of the decision in the Tenth Circuit of *Ramos v. Lamm*, 713 F.2d 546 (10th Cir.1983), where the Court held that it is the responsibility of the person seeking fees to submit fee applications which enable the Court to make a reasonable determination concerning the reasonableness of the hours claimed and the nature of the services performed.

The Committee's report makes particular note of the fact that the standards established both in this Court's interim order and in the *Ramos,* case, *supra,* have been met by the professionals in their fee applications with various degrees of success. Where a particular fee application has been less than complete, the Committee has recontacted the professional involved and sought to obtain additional information concerning the application. In undertaking this evaluation, the Committee has commented specifically on the inherent difficulties and the burdens that such record-keeping can cause. The Committee states in its report:

> In discussions with applicants, various parties have stated that they believe certain judicial guidelines established by prior precedence are in substance inefficient, oppressive, and may even be more costly to the estate. The Committee has some sympathy with that position, but it is nonetheless bound to follow what it believes to be the law. Applicants should not be penalized for failing to achieve perfection, but nevertheless applicants must submit adequately detailed statements for compensation. Audit Committee Report, page 2.

■ The Court concurs with the view of the Committee. Certainly we must follow established law, but it must be followed with an eye toward the realities of the circumstances, the purposes for which the guidelines were imposed and the results that are sought to be achieved. In the *Ramos* case, *supra,* the court was concerned with a civil rights discrimination case. The attorneys involved were working on one definitive finite legal problem. In the typical bankruptcy case, the attorneys are involved in multitudinous matters. It is not unlike the attorneys in the *Ramos* case, *supra,* submitting fee applications for their involvement, not just in presenting the matters in that case, but in a hundred different cases, all being carried on at the same time and all with certain overlapping functions. The reality is that in the course of a single telephone call, or during a single conference, or even during the course of a hearing before the Court, the attorney may be discussing, evaluating and arguing with respect to many different matters, each of which could conceivably be the subject of a separate billing statement. While it is certainly desirable that counsel make an effort to separately allocate their time, this Court simply cannot accept the view of decisions such as *In re Amatex Corp.,* 70 B.R. 624 (Bankr.E.D.Pa.1985) which appear to impose slavish and overburdensome record-keeping requirements which, in the final analysis, result in fee applications of such enormous length and detail that they are of little ultimate value to the Court in awarding fees. Again, in this Court's view, counsel must make a reasonable effort to submit meaningful billing records from which the Audit Committee and this Court, as well as other interested parties, can make an informed evaluation of the nature, reasonableness and value of the services which have been provided.

■ 2. *New York Rates vs. Local Rates.* In this case the Committee made

the judgment at the outset that it needed the services of a law firm which had the experience, background and expertise necessary to guide and represent the Committee in an estate of this magnitude and complexity. The Committee chose as counsel the firm of Booth, Marcus & Pierce with offices in New York City. In charging for its fees that firm has utilized its normal billing rates which are consistent with rates otherwise charged in the New York City area but are in excess of the rates charged by experienced bankruptcy counsel in Denver. The Audit Committee has made note of this and has concluded that it would be appropriate that Booth, Marcus & Pierce be compensated at its standard hourly rates.

This Court has recently touched on this problem in its order on the fee application of Gibson, Dunn and Crutcher in *In re Hans B. Cantrup*, Debtor, 53 B.R. 104 (Bankr.Colo.1985). The Court there recognized that the Denver Bankruptcy Bar, at least that portion which is experienced in handling matters such as the Frontier case, while excellent in quality, is limited in quantity. Because of the size of the Frontier proceeding, by the time the Committee was organized and sought to hire counsel, many, if not most, of the experienced bankruptcy attorneys were already committed to other clients. Further, because of the complexities of this case as it pertains to the litigation with United, settlements of matters with the unions and employees, and the extensive negotiations in connection with the sale of assets, the employment of a firm such as Booth, Marcus & Pierce was reasonable.

■ Again, in the *Ramos* case, *supra,* the Tenth Circuit recognized that in unusual circumstances, attorneys should be allowed to charge fees based on the rates charged by them in their normal areas of practice. This Court agrees, and did confirm that proposition in the *Cantrup* opinion, and holds here that it is acceptable for the Court to award attorneys fees based on the rates charged by the attorney in the locale where he ordinarily practices. See *In re Jensen-Farley Pictures, Inc.,* 47 B.R.

557 (Bankr.D.Utah 1985); *Matter of Baldwin United Corp.,* 36 B.R. 401 (Bankr.S.D. Ohio 1984); *In re Wilson Foods Corp.,* 36 B.R. 317 (Bankr.W.D.Okla.1984).

■ *3. Duplication.* The Committee has expressed its concern about unnecessary duplication of legal services. In this case the Committee, as noted, has hired New York counsel. However, because of the local rules of this Court, that also necessitates the engagement of local counsel. In like manner, Frontier has had multiple counsel aiding and assisting it. The utilization of more than one law firm almost without question involves some duplication of legal services. In the case of counsel for the Committee, since the local rules of this Court mandate dualcounsel under circumstances where an out-of-state firm has been hired, such duplication, to a degree, is not only to be expected, but is not objectionable. For example, the local rule requires that local counsel must be meaningfully involved. In order to be meaningfully involved such local counsel must be informed and must attend hearings at which the out-of-state counsel are also present. The duplication of legal services for those purposes is not objectionable. On the other hand, it can be carried to extreme and a subjective evaluation must be made by the Court and the creditors to minimize excessive burdens being placed on the estate.

■ Similar problems can arise by reason of multiple attorneys for the debtor and can also arise by reason of multiple attorneys of a given firm being involved in the same matters. Here, again, the same principles can be applied. The fee applications which have been submitted reflect the fact that in order to provide the needed services on what, at times, were highly expedited matters, it was clearly necessary for multiple attorneys to be involved. This is not to say that all of those attorneys were performing the same function, but their functions were, in large part, interrelated and could not be carried out without some degree of coordination and communication among them. To this end, intraoffice conferences among counsel are not only expected but are necessary, and there is no

reason why compensation should not be provided for such services. Similarly, in preparing matters for trial, it may well occur that more than one attorney has been involved in preparing different aspects of the case and their appearance at court may be necessary even though they may not rise to be heard.

These are matters of reasonableness and of subjective judgment which must be utilized both by the billing attorneys, by the Audit Committee and by this Court in evaluating time which has been duplicitous.

4. *"Soft Time"—Meals and Travel.* In evaluating the fee applications, the Committee has made note of the appearance in the billing summaries of so-called "soft time". By this, the Committee refers to the occasional practice of attorneys billing for conferences conducted at mealtimes and for travel time.

The "soft time" problem has also been, at least indirectly, referred to in the *Ramos* decision, *supra.* In that decision, the court makes note of reports by the American Bar Association to the effect that, on average, partners in law firm produce 1,400 to 1,500 billable hours per year. The court admonishes that lower courts reviewing fee applications should use caution in approving fees where the hours expended are in excess of these so-called norms. However, the court also acknowledged that in approving fees the testimony of expert witnesses is of little assistance and that the lower courts must use their experience in evaluating the fee requests.

It has been this Court's observation that the billing norm of 1,400 to 1,500 billable hours per year expired with the advent of Xerox machines, automatic typewriters and computerized word processing, not to mention improved electronic communication and rapid air travel. All of these factors have served to greatly accelerate the practice of law, thereby placing increasing demands on the attorneys. By today's standards, at least as applied to the active practice in reorganization cases, billings of 1,400 to 1,500 hours per year would be decidedly substandard.

In this case the Court is aware from representations made at the time of the hearing to approve the sale of the assets in October that counsel worked around the clock. The time records themselves show a plethora of ten, twelve and sixteen-hour days and a constant stream of seven working-day weeks. In order to achieve productivity of this nature all available time must be utilized.

■ For counsel to accomplish all that must be accomplished day to day, mealtime may be the only time available for a conference. The Court's review of the billing records indicates, as a rule, when time is recorded as having been incurred at breakfast meetings, luncheon meetings or dinner meetings, it ordinarily is on ten or more-hour days. Often, with respect to New York counsel, it is on days when the attorneys have also been involved in travel. In evaluating the billings for time spent at meals, it might be fair to consider whether, in fact, instead of penalizing these hours, counsel should be allowed a premium for allowing business discussions to intrude into mealtime—a period most non-professional employees would consider sacrosanct private time. Of course, billing for business conferences at mealtime can be subject to abuse, but abuse has not been charged and there is no suggestion that this practice has been used to excess. Unless some specific indication of abuse appears, such as substantially all meals being used for business conferences, even on days when the attorney appears to have not otherwise been pressed for time, the Court will not arbitrarily impose deductions.

■ Travel time has also been raised as "soft time" for which some deduction could be imposed. See. *e.g., In re Amatex Corp., supra.* There are various factors here. One suggestion, sometimes made, is that there should be no charge for travel which does not occur during normal business hours. This approach appears to stem from the theory that if the attorney is taken out of the office during normal work hours, he is losing time which would otherwise be billable, but he does not suffer this

penalty if he travels outside normal work hours. Such a suggestion is inherently self-defeating. First, it simply encourages counsel to arrange their schedules so they only travel during normal business hours. This, of course, would result in unnecessary and costly layovers with subsistence at the expense of the estate. The contrary practices have been prevalent in this case. Here the time records reflect that counsel ordinarily flies in in the morning, conducts business all day and, perhaps, late at night, conducts business the following day and flies home at night after business has been concluded. The approach of only allowing billings for travel time when conducted during normal business hours also imposes penalties on professionals who are required to forego their Sundays in order to fly in for early Monday hearings or meetings, or penalizes those who are willing to fly at night, again, absorbing time otherwise available for their personal use. Under these circumstances, the professionals clearly will have given up their personal time for the benefit of their client. Should they not be compensated for that time?

The fact is that business travel is seldom pleasurable. It is tiring, trying and dangerous. This is particular true when a cross-country flight takes place at night after a full day in court or in negotiations. It is not "soft" time in this Court's view.

Travel time must be distinguished from nonproductive time spent in the office. As to travel time, the question is not whether the time spent traveling was nonproductive, but rather whether the travel time was reasonable and necessary. If the trip was necessary, then the time spent in making the trip was a part of the total time necessary for the performance of the professional services which were rendered. By contrast, if the professional spends three hours in the office performing a task which should only have taken one hour, the surplus time was not necessary and could have been avoided. Comparing nonproductive office time to travel time is not possible since one is under the control of the professional, but the other is not only not under his control, it is inherently necessary

in order for him to provide the services required.

The Court has already made note of the fact that in this case the time records of the professionals reflect long days and 7-day weeks. However, when counsel has worked well beyond what one might consider a "normal" work day or a "normal" work week, there is no imposition of a time-and-a-half or double-time billing rate. If courts insist on reducing billing rates for "soft" time, then the courts, in like manner, ought to be willing to impose substantially increased billing rates for time incurred in services provided far into the evening and on Saturdays, Sundays and holidays.

The problem with focusing on all of these various factors is that, in the final analysis, while the time spent is a guide, it is only a guide and the fixing of professional fees remains an art and not a science. In the final analysis the Court, as did the Audit Committee, must make a subjective evaluation of the reasonableness of the fees sought in light of the services rendered, the time constraints imposed, the difficulties of the problems which have been handled, the impact of the business on the attorney's ability to serve other clients, and the results achieved.

By this Court's prior procedural order, the only issue before the Court at the present time is that of the reasonableness of the interim payments made by Frontier on the monthly billings of the various professionals, which payments were made at the rate of 75% of the fee billings and 100% of expenses. The Court has reviewed the fee applications and has reviewed in detail the report of the Audit Committee for the Creditors' Committee. The Court concurs with the findings and conclusions of the Audit Committee as it pertains to the reasonableness of the fees charged and to the deductions which should be imposed in certain cases and the Court hereby adopts and incorporates herein as its findings the findings set forth in the report of the Audit Committee. Based thereon,

IT IS HEREBY ORDERED that interim disbursements made by Frontier are ap-

proved with respect to the fee application of each applicant for the quarterly billing period ended November 30, 1986, as follows:

A. Arthur Young & Company has submitted billings to Frontier for expenses of $4,769.00 and fees (at 75% of total) of $59,167.50. As recommended by the Committee, the Court will impose a reduction in the amount of $2,800.00 resulting in authorized and approved distributions by Frontier to Arthur Young & Company for the period of $61,136.50.

B. Avmark Inc. has submitted billings to Frontier for expenses of $3,926.57 and fees (at 75% of total) of $13,323.75 and distributions by Frontier to Avmark in said amounts are authorized and approved.

C. Booth Marcus & Pierce has submitted billings to Frontier for expenses of $15,906.95 and fees (at 75% of total) of $214,277.95. As recommended by the Committee, the Court will impose a reduction in the amount of $21,237.40 resulting in authorized and approved distributions by Frontier to Booth Marcus & Pierce for the period of $208,947.50.

D. Fred S. James & Co. has submitted billings to Frontier for expenses of $3,022.97 and fees (at 75% of total) of $11,662.50 and distributions by Frontier to Fred S. James & Co. in said amounts are authorized and approved.

E. Holmes and Starr has submitted billings to Frontier for expenses of $31,397.16 and fees (at 75% of total) of $141,541.62. As recommended by the Committee, the Court will impose a reduction in the amount of $8,720.00 resulting in authorized and approved distributions by Frontier to Holmes and Starr for the period of $164,218.78.

F. Katch, Anderson & Wasserman has submitted billings to Frontier for expenses of $5,275.75 and fees (at 75% of total) of $68,329.50. As recommended by the Committee, the Court will impose a reduction in the amount of $6,296.00 resulting in authorized and approved distributions by Frontier to Katch, Anderson & Wasserman for the period of $67,309.25.

G. Ludwig and Curtis has submitted billings to Frontier for expenses of $3,395.07 and fees (at 75% of total) of $33,003.75 and distributions by Frontier to Ludwig and Curtis in said amounts are authorized and approved.

H. John Osterberg has submitted billings to Frontier for expenses and fees, pursuant to the Court's order, in the amount of $5,445.37 and distributions by Frontier to John Osterberg in said amounts are authorized and approved.

I. Peat, Marwick, Mitchell & Co. has submitted billings to Frontier for expenses of $8,857.35 and fees (at 75% of total) of $239,440.88. As recommended by the Committee, the Court will impose a reduction in the amount of $8,880.00 resulting in authorized and approved distributions by Frontier to Peat, Marwick, Mitchell & Co. for the period of $239,418.23.

J. Roath & Brega has submitted billings to Frontier for expenses of $21,373.39 and fees (at 75% of total) of $285,873.03. As recommended by the Committee, the Court will impose a reduction in the amount of $7,626.00 resulting in authorized and approved distributions by Frontier to Roath & Brega for the period of $299,620.42.

K. Roberts & Associates, Inc. has submitted billings to Frontier, pursuant to the Court's order, for interim distributions of $9,443.42 and such distributions by Frontier to Roberts & Associates, Inc. are authorized and approved.

IT IS FURTHER ORDERED that the amounts by which fee applications have been reduced as set forth above shall be deducted from the respective professional's next monthly billing statement or, if a professional whose fees have been reduced has completed his services, shall be deducted out of any amounts allowable to that professional at the time of the filing of any supplemental application for the 25% balance of time charged or, with respect to any professional who does not submit any further billing requests or request for allowance of the 25% balance, shall be repaid in cash to Frontier within thirty (30) days of a billing, and

IT IS FURTHER ORDERED that the fees so allowed by this order are allowed on an interim basis only without prejudice to the right of any party to claim additional reimbursement, to object to final fee applications or to a final allowance by the Court of a greater or lesser amount than is herein allowed.