**In re FARLEY, INC., Debtor.**

**Bankruptcy No. 91 B 15610.**

United States Bankruptcy Court,
N.D. Illinois, E.D.

June 24, 1993.

Marti and Amy R. Goldstein, *Ohio Mechanics'*  *and Materialmen's Liens* § 5–7 (2d ed. 1992).

Herbert S. Edelman and Howard A. Becker, Kaye Scholer Fierman Hays & Handler, New York City and Mark K. Thomas and Jessica Tovrov, Katten Muchin & Zavis, Chicago, IL, for debtor Farley.

Dean Harvalis, Office of the U.S. Trustee, Chicago, IL.

John K. Kneafsey and Stephen G. Kehoe, Nisen & Eliott, Chicago, IL, for U.S. Diecasting & Development Co., Inc.

David N. Missner, Leroy G. Inskeep, and M. Gretchen Silver, Rudnick & Wolfe, Chicago, IL, for Pension Benefit Guar. Corp.

Joel R. Nathan, Asst. U.S. Atty., Office of the U.S. Atty., Chicago, IL.

James R. McCann and Victoria S. Crosley, Sp. Litigation Assistants, Office of the Dist. Counsel of the I.R.S., Chicago, IL.

David S. Kurtz and Cory Lipoff, Jones Day Reavis & Pogue, Chicago, IL, for Doehler–Jarvis.

### MEMORANDUM OPINION ON FINAL FEE APPLICATION OF KAYE SCHOLER FIERMAN HAYS & HANDLER

JACK B. SCHMETTERER, Bankruptcy Judge.

Following confirmation of Debtor Farley, Inc.'s Plan of Reorganization, its attorneys in the firm of Kaye, Scholer, Fierman, Hays & Handler ("Kaye Scholer") submitted their final application for fees of $2,603,618.11 and disbursements of $405,687.68. The Pension Benefit Guaranty Corporation ("PBGC") objected to the hourly rates charged by the Kaye Scholer attorneys and paralegals. This was the only objection. The reorganized debtor recommended approval of these attorneys' fees at a reduced amount of $2,403,618.11 negotiated by it with counsel. The application and the PBGC objection thereto were set for hearing at which this Court took evidence. Arguments of the applicant and objector have been considered.

For reasons given herein, the PBGC's objection to hourly rates is overruled, and Kaye Scholer's fee application has by prior order been entirely allowed. This Opinion will stand as Findings of Fact and Conclusions of Law following the hearing.

### FACTS

This proceeding was started on July 24, 1991 by the filing of an involuntary petition under Chapter 7 of the Bankruptcy Code. Farley consented to entry of an order for relief, and exercised its right under 11 U.S.C. § 706(a) to convert the proceeding to one under Chapter 11 of the Bankruptcy

Code. 11 U.S.C. § 1101, *et seq.* Farley operated as *debtor-in-possession* from then until December 1, 1992, when its Fourth Amended Plan of Reorganization was confirmed. That complex Plan was the product of difficult negotiations among several major creditor classes, including PBGC itself, and was of substantial benefit to those different classes and to the debtor.

Kaye Scholer served as Farley's bankruptcy counsel from September 24, 1991 through and including December 31, 1992— the period for which these attorneys sought fees and disbursements. No party objected to the quality of the Kaye Scholer work or to the amount of time spent on any given project. Kaye Scholer's application was properly filed pursuant to Fed. R.Bankr.P. 2016. The form of the application complies with informational requirements outlined in *In re Pettibone,* 74 B.R. 293 (Bankr.N.D.Ill.1987), and *In re Wildman,* 72 B.R. 700 (Bankr.N.D.Ill.1987). The amount of time devoted to various tasks performed by Kaye Scholer was reasonable and necessary. The allocation of work between partners, associates, and paralegals was reasonable. The disbursements, while quite large, were documented. PBGC did not challenge any of these matters. Nor has PBGC or anyone else challenged the quality of work or value of the results to the estate and its creditors.

Farley's bankruptcy case was an extremely large and complex reorganization that was confirmed only sixteen months after the proceeding commenced. There were discussions of possible agreement between Farley's counsel and its major creditor constituencies from the outset. The major creditor constituencies included the Bank of New York, the United Automobile Aerospace and Agricultural Implement Workers of America (the "UAW"), and holders of certain junior and senior subordinated debt instruments. Creditors within those creditor constituencies were spread throughout the nation, and held several hundred million dollars of claims against Farley.

In addition to these creditors, several other parties held disputed and unliquidated claims. These parties included PBGC, some personal injury claimants, a class of plaintiffs suing Farley and others for alleged violations of securities laws, and the United Steelworkers of America. These disputed claims had to be liquidated in several different forums throughout the country. In the aggregate, they alleged that Farley owed them over $100 million. No plan could be confirmed unless and until these claims could be managed or liquidated below a level the debtor could manage.

Farley's assets included direct or indirect ownership of stock in Fruit of the Loom, Inc. and West Point–Pepperell, Inc. (now known as Valley Fashions) as well as operating divisions located in Chicago and elsewhere. The fate of Farley's case depended in part on the reorganization of West Point Acquisition Corporation in a separate Chapter 11 proceeding pending in the Southern District of New York.

Given the complexity of issues confronting Farley's reorganization, and because reorganization of its debt would have widespread effects, it was clearly appropriate for Farley to choose bankruptcy counsel experienced in major work to handle its reorganization.

Kaye Scholer is mainly based in New York City, and all Kaye Scholer attorneys assigned to the Farley case work out of the New York office. Mr. Herbert Edelman was the senior and supervising attorney at Kaye Scholer for the Farley case. He has substantial experience in bankruptcy law. He and other counsel in Kaye Scholer have served as lead bankruptcy counsel for debtors in nationally prominent bankruptcy cases. They have also counseled a number of large national businesses on bankruptcy or bankruptcy-related matters.

Mr. Edelman and the bankruptcy group at Kaye Scholer devote the bulk of their time to representing corporate debtors in bankruptcy. About 25% of their time is devoted to representing and advising clients outside of bankruptcy, and 15 to 20% of their time is spent representing creditors in bankruptcy. Thus, Kaye Scholer's bankruptcy group must submit fee

applications to bankruptcy courts for 55 to 60% of their work, that portion representing debtors.

Kaye Scholer reduced its request for fees in this case by $200,000 at Farley's request, following negotiations with debtor's general counsel after the fee application was filed. This had the effect of a 7.7% decrease in the billing rates.[1] Mr. Edelman initially billed his services to Farley, Inc. at a rate of $475/hour. After applying the negotiated decrease, the effective rate now requested by counsel is about $438.50. This rate is commensurate with rates charged and collected by other partners in his firm with similar experience. The evidence shows that Mr. Edelman currently charges and collects the full rate of $475/hour for services rendered to his other clients.

His usual rate is commensurate with rates of other attorneys at competing New York firms with similar experience. Mr. Edelman testified, without contradiction, that several top litigators in New York City are currently charging and collecting $500/hour or higher. He further testified that some prominent bankruptcy practitioners in New York City currently charge $500/hour.

In addition to Mr. Edelman, 13 other partners and 35 associates at Kaye Scholer worked on Farley matters. The rates for these other partners ranged from $475 to $300/hour, depending on seniority and experience. The rates for associates ranged from $125/hour for first year lawyers (less than one year of legal experience) to $300/hour for those with eight or nine years of experience. Paralegals and other clerical staff members were also used. Their rates range from $50/hour for "Legal Clerks" to $95/hour for some experienced paralegals. Like hourly rates of the attorneys, these hourly rates were also effectively reduced by 7.7% by the negotiated $200,000 reduction in Kaye Scholer's fee request.

A "blended rate" for all of Kaye Scholer's work may be computed by taking the total of all fees now requested and then dividing that figure by the sum of all hours billed by all attorneys and paralegals who did the work. The present fee request is $2,403.618.11 ($2,603,618.11 less the $200,000 reduction), and a total of 11,299.8 hours were billed. Thus, the "blended rate" requested by Kaye Scholer is about $213/hour.

While rates charged by Kaye Scholer are competitive with other prominent New York law firms, they are substantially higher than those of firms located in Chicago, including firms involved in this proceeding. For example, at Rudnick & Wolfe, partners charge $180 to $315/hour, and associates' time is billed at $95 to $180/hour. PBGC argues that several firms in Chicago had the expertise and capabilities necessary to successfully represent Farley through its reorganization. In this regard, PBGC is correct. However, at the outset of this proceeding, Farley's experienced general counsel conducted an inquiry as to which lead bankruptcy counsel to employ. Farley, Inc. accepted his recommendation of Kaye Scholer because of the substantial experience of that firm, the convenient access between counsel and client in New York, and—most importantly—a comfortable relationship of mutual confidence that developed between client and counsel. For reasons earlier discussed, Farley's reorganization was correctly foreseen as a difficult and complex job. It was appropriate for Farley to retain a major firm such as Kaye Scholer to serve as its lead bankruptcy counsel, and not unreasonable for it to select the firm chosen by its general counsel.

The reorganized Farley itself has no objection to paying Kaye Scholer's reduced fees. In a statement to this Court on that question, it described that firm's role in its reorganization:

[Kaye Scholer] was lead counsel to Farley throughout the chapter 11 case and was involved, either directly or indirectly, in the resolution of virtually every major

---

1. The parties did not specify how the $200,000 would be applied. They did not agree that specific categories of the bill or a specific time of attorneys would be eliminated or reduced. Rather, the $200,000 simply went to reduce the overall original fee request of $2,603,618.11.

issue to confront Farley during these proceedings. The firm was instrumental in keeping the case on track toward confirmation despite many seemingly insoluble obstacles; it spearheaded Farley's successful plan negotiations with, *inter alia*, the [PBGC], the [UAW], the Bank of New York and the Creditors' Committee; it was responsible for preparing and overseeing approval of the disclosure statement, drafting the plan and many of the plan documents and overseeing the confirmation process. Finally, its services were performed under time constraints which, at the insistence of the Creditors' Committee and other parties in interest, ranged from the difficult to the impossible. Kaye Scholer's services were of exceptionally high quality throughout the case and it is due in large part to their efforts that this case was successfully concluded. Furthermore, their overall bankruptcy and corporate knowledge and expertise were instrumental in reaching final resolution of numerous issues which arose herein.

*Debtor's Recommendations Concerning Certain Applications For Final Allowances of Compensation and Reimbursement of Expenses* at 4–5. Coming from a reorganized and viable debtor paying the fees out of its own assets, that view carries weight.

## DISCUSSION

### Jurisdiction

This proceeding is before the Court pursuant to 28 U.S.C. § 157 and Local District Rule 2.33. Subject matter jurisdiction lies under 28 U.S.C. § 1334(b). Also, the Court has retained jurisdiction under Article VIII of the Plan to "hear and determine all applications for compensation of professionals and reimbursement of expenses under Bankruptcy Code § 330, 331 or 503(b)." This is a core proceeding under 28 U.S.C. § 157(b)(2)(A).

### PBGC HAS STANDING TO OBJECT

■ Kaye Scholer first argues that PBGC lacks standing necessary to object to its fee application. Whether a party has standing is determined by 11 U.S.C. § 1109(b) which provides that,

> A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or an indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

Interpreting this section, the Seventh Circuit has stated that

> all [§ 1109(b) ] means is that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains, thus making explicit what is implicit in an *in rem* proceeding—that everyone with a claim to the *res* has a right to be heard before the *res* is disposed of since that disposition will extinguish all claims.

*Matter of James Wilson Associates*, 965 F.2d 160, 169 (7th Cir.1992). An examination of PBGC's role in Farley's reorganization demonstrates that it has an interest that could be affected indirectly by the allowance or disallowance of Kaye Scholer's fee application.

PBGC guarantees payment of pension benefits upon termination of certain types of pension plans listed in Title IV of the Employment Income Security Act ("ERISA"). 29 U.S.C. §§ 1321, 1322, and 1361. Farley is the contributing sponsor of five pension plans that are under Title IV of ERISA. Thus, PBGC insures benefits due under these plans. If Farley should terminate those plans without providing for sufficient assets to fund the pension benefits guaranteed by PBGC, then PBGC would have the right to hold the reorganized Farley liable for the full amount of the unfunded pension benefits covered by PBGC's guarantee. 29 U.S.C. § 1362.

PBGC filed claims in Farley's case to protect itself in the event that Farley chose to terminate one or more of its pension plans without providing for sufficient assets to cover PBGC-guaranteed benefits. These claims alleged over $55 million in such benefits.

Farley deals with this contingent liability in its Plan by agreeing to make certain payments earmarked for the reduction or elimination of the underfunding problem. Farley further pledged 325,000 shares of Fruit of the Loom, Inc. ("FTL") stock to PBGC as security for that future obligation. *See* Fourth Amended Disclosure Statement, at 81–84 (discussing resolution of PBGC's claim). The Plan further provides in § 7.10 that confirmation does not affect liability of the reorganized Debtor to PBGC in event that one or more of Farley's pension plans are terminated post-confirmation.

The pension plans were not terminated before the Plan was confirmed. PBGC withdrew its contingent claims against Farley in consideration for its continued promise to make payments and the pledge of FTL shares. Farley had not terminated any pension plans as of the date of Kaye Scholer's fee application hearing. However, PBGC has retained its status as guarantor of certain pension benefits owed by Farley, even though its active claims were withdrawn. It has further retained its right to sue Farley in the event that the reorganized debtor ever terminates a pension plan with unfunded liabilities. Thus, PBGC holds a significant interest in the financial health of reorganized Farley. It continues to face a $55 million possible exposure should Farley be left with insufficient assets to fund its pension plans. The money to pay the professional fees of Kaye Scholer and other firms is coming out of the debtor's coffers—money which might otherwise be used to fund its pension liabilities. Based on these facts and because the fees sought are quite large, PBGC has rights and interests that are potentially affected by Kaye Scholer's fee application.

In *In re Hathaway Ranch Partnership*, 116 B.R. 208 (Bankr.C.D.Cal.1990), the debtor submitted an application to employ counsel. A limited partner of the general partner of the debtor attempted to file a memorandum in opposition to this application, and the debtor objected to this limited partner's standing to object. The objector was found to have had a financial interest in the debtor's bankruptcy estate, despite not being among the groups specifically listed in § 1109(b). *Id.*, at 213. Use of the word "including" in § 1109(b) "means that the entities listed in § 1109(b) are not the only parties in interest who may appear and be heard in a case under Chapter 11." *Id. See also* 11 U.S.C. § 102(3) (" 'includes' and 'including' are not limiting").

In *In re Johns–Manville Corp.*, 36 B.R. 743 (Bankr.S.D.N.Y.1984), the court considered a motion to appoint a legal representative for the class of people who would become claimants due to asbestos exposure. As a predicate to discussing the future claimants' right to counsel, the court analyzed whether future claimants had standing to appear and be heard under § 1109(b). The court found that

> ... a resolution of the interests of the future claimants is a central focus of these reorganization proceedings. Any plan emerging from this case which ignores these claimants would serve the interests of neither the debtor nor the creditor constituencies in that the central short and long-term economic drain on the debtor would not have been eliminated.

36 B.R. at 746. Consequently, the potential future claimants were found to have standing. *Id.* at 747–57. Similarly here, PBGC is a potential future claimant of considerable importance to the future of reorganized Farley, Inc.

■ Section 1109(b) should be broadly construed in order to allow parties affected by a Chapter 11 case to appear and be heard. *In re Bumper Sales, Inc.*, 907 F.2d 1430, 1433 (4th Cir.1990); *In re Public Service Co. of New Hampshire*, 88 B.R. 546, 550 (Bankr.D.N.H.1988). PBGC in this case has a financial interest in the debtor which is indirectly affected by the large requested fees. Therefore, like the limited partner in *Hathaway* and the future claimants in *Johns–Manville*, PBGC has standing under § 1109(b) to object to Kaye Scholer's fees. The Seventh Circuit's test in *James Wilson Associates* quoted above is met.

### THERE WAS NO WAIVER BY PBGC

■ Kaye Scholer also argues that PBGC waived its right to object to its hourly rates in response to the fee application because it never raised such an objection when Farley moved to retain Kaye Scholer as its counsel in this case. This argument has no merit.

The issue of hourly rates was not raised when Farley moved to retain Kaye Scholer. That motion did not discuss hourly rates; instead, it simply requested that an order be entered authorizing the firm's retention. *See* Farley's Motion, filed Sept. 24, 1991. The order was signed by Bankruptcy Judge Squires of this Court (who was initially assigned to the proceeding) the day that it was presented. The only mention of fees in the Order is this clause: "Kaye, Scholer shall be compensated upon proper application, notice and a hearing, and pursuant to an order of this Court, in accordance with the procedures set forth in §§ 330 and 331 of the Code". Order, entered Sept. 24, 1991. No issue as to hourly rates of counsel was either presented or resolved. Moreover, the evidence did not demonstrate that PBGC acted in any way to waive its right to object to Kaye Scholer's hourly rates.

Some courts have indicated in *dicta* that it would be unfair to reduce hourly rates at the close of a case after the professionals had already expended all their time and effort. For example, the opinion in *In re Washington Manufacturing Co.*, 101 B.R. 944 (Bankr.M.D.Tenn.1989), stated:

> It might be argued that the objectors had waived their objections to the employment of non-local counsel by not timely moving that the Court set aside its order approving the employment of [the non-local firm], and the Court notes that immediately upon the filing of these cases, there was activity before the Court in which [the non-local counsel's] participation was made known to the objecting parties. However, it is not necessary for a waiver to be imposed....

*Id.* at 948. *See also In re Baldwin United Corp.*, 36 B.R. 401, 401 (Bankr.S.D.Ohio 1984) ("Both fairness and sound judicial policy dictate that the parties and their counsel be given some measure of certainty regarding [hourly rates] from the outset ...."). However, Kaye Scholer neither asked for nor was it given any assurance at the start of this case that it would be awarded fees based on the hourly rates that it normally billed. Indeed, the order authorizing the retention makes clear that Kaye Scholer's fees would only be awarded after notice and a hearing held pursuant to § 330. Thus, PBGC was entitled to rely on this order in bringing its objection when fees were applied for, and Kaye Scholer had no guarantee of rates to rely on when it started work herein. Given the multiple standards to be considered by a Bankruptcy Judge under § 330 when fee applications are presented, it is doubtful whether such a guarantee should ever be given to debtor's counsel in a Chapter 11 proceeding. In any event, no such guarantee was given here.

### THE OBJECTION TO HOURLY RATES IS MISPLACED

The only issue here is whether the hourly rates of debtor's New York counsel are too high for a reorganization in a Chicago-filed proceeding. There are many other elements to be considered in review of fee petitions in bankruptcy, *see, e.g., Matter of Caribou Partnership III*, 152 B.R. 733, 737–8 (Bkrtcy.N.D.Ind.1993), but those matters went unchallenged and were approved herein.

#### (a) *Section 330 Requires Market Analysis*

Section 330 of the Bankruptcy Code governs the awarding of attorneys fees. It provides, in relevant part:

> After notice to any parties in interest and to the United States Trustee and a hearing ... the court may award ... to the debtor's attorney—
>
> (1) reasonable compensation for actual, necessary services rendered by such ... attorney ... based on the nature, the extent, and the value of such services, the time spent on such services, and the cost of comparable services

other than in a case under this title. . . .

11 U.S.C. § 330(a).

Prior to enactment of this provision, economy of administration was the paramount consideration in determining attorney fee awards. *Matter of U.S. Golf Corp.*, 639 F.2d 1197, 1201 (5th Cir.1981); 3A *Collier on Bankruptcy*, ¶ 62.05[1] (14th Ed.1975). Thus, a judge considering a fee application under the Bankruptcy Act was to award fees "at the low end of the spectrum of reasonableness". *U.S. Golf*, 639 F.2d at 1201, *quoting In re First Colonial Corp.*, 544 F.2d 1291, 1299 (5th Cir.), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977).

In shifting the focus to "the cost of comparable services" compared to non-bankruptcy cases, Congress rejected the "spirit of economy" notion in favor of a market approach to determining fees. *See* 1243 Cong.Rec. H11091 (daily ed. Sept. 28, 1978) (remarks of Rep. Edwards), and 124 Cong.Rec. S17408 (daily ed. Oct. 6, 1978) (remarks of Sen. DeConcini):

[B]ankruptcy legal services are entitled to command the same competency of counsel as other cases. In that light, the policy of this section is to compensate attorneys and other professionals serving in a case under title 11 at the same rate as the attorney or other professional would be compensated for performing comparable services other than in a case under title 11. ... Notions of economy of the estate in fixing fees are outdated and have no place in a bankruptcy code.

*See also Matter of UNR Industries, Inc.*, 986 F.2d 207, 208 & 209 (7th Cir.1993):

In enacting section 330, Congress intended to move away from doctrines that strictly limited fee awards under section 241 [of the Bankruptcy Act of 1898]. . . .

In section 330 and its legislative history Congress expressed its intent that compensation in bankruptcy matters be commensurate with the fees awarded for comparable services in non-bankruptcy cases.

■ The purpose of § 330 was to encourage bankruptcy practitioners not to leave the field in favor of more lucrative areas of the law. *See* H.R. 95–595, 95th Cong., 1st. Sess. 329–30 (1977), *reprinted in* U.S.Code Cong. & Admin.News, at 6286 (1978):

The effect of [§ 330] is to overrule *In re Beverly Crest Convalescent Hospital, Inc.*, 548 F.2d 817 (9th Cir.1976, as amended 1977) ... and other, similar cases that required fees to be determined based on notions of conservation of the estate and economy of administration. If that case were allowed to stand, attorneys that could earn much higher incomes in other fields would leave the bankruptcy arena. Bankruptcy specialists, who enable the system to operate smoothly, efficiently, and expeditiously, would be driven elsewhere. . . .

**(b)** *The Simulated Market Approach*

■ Section 330 therefore requires analysis as to whether fees requested in bankruptcy would compensate on the same market basis as fees for comparable non-bankruptcy services. One approach to this analysis is to consider comparable billing rates outside of bankruptcy. Another possible approach, and one that is meaningful here, is to consider whether true market forces have valued the services of counsel.

■ To apply the standard under § 330, a Bankruptcy Judge must usually follow an analysis that simulates a free market for legal services to debtor. While some have urged that the law profession experiment with billing based on "value pricing", *see e.g.* "Getting a Jump on the Bean Counters," 2 *Business Law Today*, No. 4 pp. 11, *et seq.*, March/April 1993, that is not yet the method generally used. So long as the profession generally bills based on hourly lodestar, one approach in ascertaining the reasonable value of hourly work is to ask what professional fee applicants could earn by the hour if they were not representing the debtor. This question can only be answered by examining the market for legal services open to those applicants.

The Seventh Circuit has ruled on what constitutes the "market rate" for legal services in the context of fee awards given

pursuant to fee-shifting statutes.[2] In *Gusman v. Unisys Corp.*, 986 F.2d 1146 (7th Cir.1993), plaintiff prevailed in an age discrimination suit and then sought attorney's fees pursuant to 29 U.S.C. § 626(b). Under that statute, counsel was entitled to collect from defendant a "reasonable attorney's fee". *Id.* at 1148, *citing* 29 U.S.C. § 216(b). The case was tried in Madison, Wisconsin, but the plaintiff's attorneys were members of a firm that had its principal office in Chicago, and they billed their time at rates commensurate to comparable Chicago firms. These rates were higher than those prevailing among Madison attorneys, and the district court only awarded them for the value of their time computed at Madison rates.

The Seventh Circuit reversed, holding that the hourly rate normally charged by the attorney is presumptively the reasonable rate:

> [T]he best measure of an attorney's time is what that attorney could earn from paying clients. For a busy attorney, this is the standard hourly rate. If he were not representing this plaintiff in this case, the lawyer could sell the same time to someone else. That other person's willingness to pay establishes the market's valuation of the attorney's services.

*Id.* at 1150.

The court noted, however, that the attorney's billing rate is a presumption, and not a dispositive figure. *Id.* Further, the strength of this presumption depends upon the nature of the attorney's practice. If an attorney bills the vast majority of time at a set rate for paying clients and spends a small percentage of time on cases covered by fee-shifting statutes, there is a strong presumption that such counsel could have billed out remaining time at the rate normally charged. However, the presumption is weak for attorneys who must collect the bulk of their fees through fee-shifting statutes, for "[s]elling the first 5% of one's

time is much easier than filling the remaining 95% of the timesheet." *Id.*

Courts may therefore decline to award attorneys the normally charged rates. The Seventh Circuit cautioned, however, that a "judge who departs from this presumptive rate must have some reason other than the ability to identify a different average rate in the community." *Id.*

*Gusman* is the Seventh Circuit's most recent pronouncement on this subject. Other recent cases in this Circuit also support the principle that a "reasonable rate" is determined by the market, i.e. what that attorney could have been collecting directly from paying clients for comparable work.

*Barrow v. Falck*, 977 F.2d 1100 (7th Cir. 1992), and *Pressley v. Haeger*, 977 F.2d 295 (7th Cir.1992), cited to *Matter of Continental Illinois Securities Litigation*, 962 F.2d 566 (7th Cir.1992), in endorsing the position that the reasonable hourly rate to use in fee-shifting cases is the market rate, and that market rate is determined by analyzing the fee applicant's lost opportunity costs for taking the case. Both *Barrow* and *Pressley* were civil rights cases brought under 42 U.S.C. § 1988 in which the plaintiffs' attorneys' fee awards were appealed. In *Barrow*, the court stated:

> These cases [referring to *Blum v. Stenson*, 465 U.S. 886, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984), and *Save Our Cumberland Mountains, Inc. v. Hodel*, 857 F.2d 1516 (D.C.Cir.1988)], like our own opinion in *Continental Illinois Securities*, hold that the market rate of legal time is the opportunity cost of that time, the income foregone by representing this plaintiff.

977 F.2d at 1105. In *Pressley*, the court quoted *Continental Illinois Securities*, 962 F.2d at 568, stating:

> It is not the function of judges in fee litigation to determine the equivalent of the medieval just price. It is to determine what the lawyer would receive if he

**2.** Cases discussing standards under fee-shifting statutes are persuasive, but not controlling, authority in analyzing attorney's fees issues under § 330. *See UNR Industries,* 986 F.2d at 210 ("neither common fund nor the fee-shifting standards are controlling, but … the fee-shifting precedent may be instructive, particularly as some of its principles are incorporated in section 330").

were selling his services in the market rather than being paid by court order. 977 F.2d at 299. *Eddleman v. Switchcraft, Inc.*, 965 F.2d 422, 424 (7th Cir.1992) was an age discrimination case brought under the same statute at issue in *Gusman,* in which the court stated:

> The reasonable hourly rate to be used in computing the lodestar figure should be based on the appropriate market rate for the attorney's work. [citations omitted] The market rate is 'the rate that lawyers of similar ability and experience in the community normally charge their paying clients for the type of work in question.' *Henry v. Webermeier,* 738 F.2d 188, 193 (7th Cir.1984).

*Continental Illinois Securities, supra,* concerned the appeal of attorneys' fee award given in a class action case. The district court set a ceiling on the hourly rates of the attorneys. The Seventh Circuit determined that this was error, and that the judge should have determined "what the lawyer should have received if he were selling his services in the market rather than being paid by court order." 962 F.2d at 568. The Circuit then suggested in *dicta* (and later ordered by mandamus, *See Continental Illinois Securities Litigation,* 985 F.2d 867 (7th Cir.1993)) that the district court determine fees by determining what the attorneys would have received if they had negotiated a contingency fee agreement with an individual client rather than a class. 962 F.2d at 572.

In determining that hourly rates requested here by Kaye Scholer are reasonable, it was first found that the firm's attorneys could charge and collect comparable hourly rates on comparable non-bankruptcy projects. Kaye Scholer could have charged and did ordinarily charge and collect its rates from paying clients on such engagements.

### (c) *Real Market Factors Valued Counsel's Services Here*

■ A second, and in this case even stronger, approach is to determine market value of services in bankruptcy by ascertaining whether actual market forces and procedures are at work, rather than simulating a market by looking at charges to other clients. An actual market requires parties bargaining at arm's length for services or goods to be paid for by the consumer. In a true market, demand for legal services arises out of clients who have weighed the costs and benefits to them of retaining counsel, and expect to pay the costs. In most bankruptcy proceedings, of course, the debtor is insolvent. In such cases, the debtor's assets in a real sense belong to the creditors, and any payment to the debtor's attorneys must come from assets that would otherwise have been distributed to creditors. This is certainly the case in Chapter 7 cases as well as in liquidating or failed Chapter 11 proceedings. Indeed, in most bankruptcy cases, the money for legal services comes out of the creditors' pockets. This fact usually skews the "market" for bankruptcy services because insolvent debtors get a benefit from retaining bankruptcy counsel, but they do not bear the corresponding costs. Therefore, their search for counsel is usually not inhibited by the financial concerns that discipline parties who must pay from their own assets. In deeply insolvent cases or in failed or liquidating Chapter 11 cases, it is doubtful that debtors have free rein to employ counsel of their choice who charge unusually high rates and will impose heavier-than-usual expenses.

■ In this case, however, the market was not skewed. Farley initially conducted a careful search for able counsel. Following confirmation of its Plan, the money to pay final attorneys' fees all comes out of Farley's post-confirmation assets rather than from the creditors, whose distributions under the Plan are not affected at all. Thus, one characteristic of the open market for legal services—that the client pays out of its own assets—is present post-confirmation in this case. The effect of Farley's post-confirmation viability on the fee application process is illustrated by its incentive to bargain successfully for a significant reduction in fees. A very strong presumption arises in this circumstance that the rates charged by Kaye Scholer and agreed to by Farley reflect actual market value of

the services. After all, the reorganized Farley has the incentive to make the same cost-benefit calculation that any client has to make in the market for legal services.

Further strengthening this presumption is the sophistication displayed by Farley in retaining Kaye Scholer and in negotiating a reduction. Farley's General Counsel, Mr. Kenneth Greenbaum, testified at the hearing on this subject. It is clear from his testimony that Farley has considerable experience in retaining and paying attorneys due to its extensive business activity. These lawyers were chosen only after consultation with a variety of people in the legal and investment banking fields. Farley knew what it was getting into when it retained Kaye Scholer.

As previously discussed, the Kaye Scholer rates are commensurate with those charged by comparable New York attorneys who work on commercially significant transactions and litigation in non-bankruptcy as well as bankruptcy matters. It is likely that Mr. Edelman and the other Kaye Scholer attorneys could have attracted other clients who would pay their rates had they not been retained by Farley. Thus, evidence supports the conclusion that rates charged by Kaye Scholer represent its lost opportunity cost of taking on Farley as a client. Finally, and most significantly here, the reorganized Farley negotiated at arm's length the final amount to be paid to its professionals out of its assets, thus fixing the actual market value of services paid for.

#### (d) *Debtor's Counsel Are not Bound by Chicago Rates in this Successful National Case*

■ Even assuming that counsel's fee rates are appropriate in New York, PBGC objects to Kaye Scholer charging rates prevailing among major New York City law firms rather the average rates prevailing among Chicago firms involved in this case, since Chicago is where this bankruptcy case was filed. That view clearly has no merit. First, the Seventh Circuit has expressly rejected the argument in *Gusman*. Further, the market value of legal services in this case was actually established here

both by proof of lost opportunity cost, and actual post-confirmation negotiations and real market forces. Second, PBGC concedes and this Court has found that the Farley bankruptcy proceeding had national scope. In "national" cases, courts have generally held that debtors' attorneys may charge the rates prevailing where their offices are located. *See In re Washington Manufacturing Co.*, 101 B.R. at 952; *In re Yankton College*, 101 B.R. 151, 160 (Bankr.D.S.D.1989); *In re Temple Retirement Community, Inc.*, 97 B.R. 333, 342–43 (Bankr.W.D.Tex.1989); *In re Public Service Co. of New Hampshire*, 86 B.R. 7, 10 (Bankr.D.N.H.1988); *In re Frontier Airlines, Inc.*, 74 B.R. 973, 977 (Bankr. D.Colo.1987); *In re Jensen–Farley Pictures, Inc.*, 47 B.R. 557, 574–79 (Bankr. D.Utah 1985); *In re Wilson Foods Corp.*, 36 B.R. 317, 321 (Bankr.W.D.Okla.1984). *Cf. In re Cambern*, 134 B.R. 565 (Bankr. E.D.Tex.1991), and *In re Waldoff's, Inc.*, 132 B.R. 329 (Bankr.S.D.Miss.1991) (both finding that only local rates should be awarded because the cases had only local significance).

■ PBGC points out that there are several law firms in Chicago that were entirely capable of successfully representing Farley in this bankruptcy. That is certainly true. However, the choice of a New York City law firm was appropriate given the complexity of the case and the close relationship between the reorganization of Farley, Inc. and the reorganization of its affiliate, West Point Acquisition Corporation, which was pending in the Southern District of New York. Furthermore, a debtor in a "national case" is usually entitled to counsel of its own choice from outside the court district where there are serious prospects for reorganization, *Public Service Co. of New Hampshire*, 86 B.R. at 9, although there may be many reasons, particularly in a failed case, why such counsel might not be allowed full payment.

Finally, PBGC points out that Kaye Scholer's rates were higher than those of other experienced law firms appearing in this case, and those Chicago rates set the outside value of service here. However, this

is not a reason by itself to reduce the hourly rates. As the Seventh Circuit pointed out in *Gusman,*

> Lawyers do not come from cookie cutters. Some are fast studies and others require more preparation. Some are nimble on their feet and apt to achieve better results at trial. Some have deeper insight and in a few hours may find ways to prevail ... that will elude their colleagues. Clients are willing to pay more, per hour, for these better lawyers.... Markets recognize these truths; judges must too. Only an assumption that all lawyers are identical could support the averaging approach, under which all lawyers in a division of the Court receive the same hourly fee.

986 F.2d at 1149–50. We cannot suppose that every lawyer is alike and that all lawyers could achieve the same results for the same effort.

Thus, PBGC's approach is misplaced.

### CONCLUSION

Based on reasons stated above, PBGC's objection to Kaye Scholer's fee application is overruled. Since there were no other objections, and since the Court has already reviewed this application and found it to be otherwise satisfactory, Kaye Scholer's application was allowed by order previously entered.